D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
IN RE COMVERSE TECHNOLOGY, INC.
SECURITIES LITIGATION

**MEMORANDUM AND ORDER**

06-CV-1825 (NGG) (RER)

------------------------------------------------------X
NICHOLAS G. GARAUFIS, U.S. District Judge.

On August 16, 2006, the court referred all pre-trial matters in this consolidated securities

class action to Magistrate Judge Ramon E. Reyes, Jr. ("Judge Reyes"). (Docket Entry # 39.) On

July 30, 2007, Defendants in this action — Comverse Technology, Inc. ("Comverse"), Jacob

"Kobi" Alexander ("Alexander"), David Kreinberg ("Kreinberg"), William F. Sorin ("Sorin"),

John H. Friedman ("Friedman"), Sam Oolie ("Oolie"), and Ron Hiram[1] ("Hiram") (collectively,

"Defendants") — filed motions to dismiss or partially dismiss lead plaintiffs Menorah Insurance

Co. Ltd. and Mivtachim Pension Funds, Ltd.'s (collectively, "Menorah Group") Consolidated

Amended Complaint ("Compl.") dated March 23, 2007. (Docket Entry # 74.)

Now before me are the parties' objections to Judge Reyes's Report & Recommendation

("R&R") dated October 31, 2007. (Docket Entry # 135.) Pursuant to 28 U.S.C. § 636(b)(1) and

Fed. R. Civ. P. Rule 72(b) the court conducts a *de novo* review of those portions of the R&R to

which the parties have objected. The parties have waived their right to further judicial review of

those portions of the R&R to which they have not timely objected. Mario v. P & C Food Mkts.,

Inc., 313 F.3d 758, 766 (2d Cir. 2002).

## I.    BACKGROUND

For the purpose of reviewing Defendants' motions to dismiss, the court accepts as true all

---

[1] Hiram filed his motion to dismiss on August 21, 2007. (Docket Entry # 125.)

factual allegations in Menorah Group's Complaint. Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000).

Comverse is a New York-based telecommunications company. (Compl. at ¶ 28.) Menorah Group, which represents the class of plaintiffs who purchased Comverse common stock between April 30, 2001 and November 14, 2006 ("Class Period") ("Plaintiffs"), alleges that Defendants falsified Comverse's financial statements in order to mislead the investing public about Comverse's true financial condition and thereby inflate Comverse's stock price. (Id. at ¶¶ 1-2.) Central to the alleged fraud was a stock option backdating scheme, in which Comverse granted undisclosed "in-the-money" stock options to its employees by backdating its stock option grants to coincide with dates when the price of its stock was low. (Id. at ¶¶ 3, 7.) Some of these backdated options were allegedly funneled by Alexander, Comverse's CEO and Chairman, and Kreinberg, its CFO,[2] into a hidden "slush fund" from which they then granted options to various Comverse employees. (Id. at ¶¶ 21-22, 54-56.) Menorah Group also alleges that Comverse improperly accounted for other matters, including prematurely recognizing revenue on certain contracts with customers, improperly classifying certain expenses, and improperly treating tax deferral accounts. (Id. at ¶ 57.)

A.    The Stock Option Backdating Scheme

According to the Complaint, stock options and backdating, as relevant to the allegations in this case, function as follows.

Stock options give their holders a right to buy shares of stock at a pre-set price called the

---

[2] Kreinberg served as Comverse's CFO from May 1999 until his resignation on May 1, 2006. From 2002 until his resignation, Kreinberg served as Comverse's Vice President of Finance. (Id. at ¶ 22.)

"exercise price." (Id. at ¶ 29.) A key purpose of employee stock options is to give employees an incentive to increase shareholder value. (Id. at ¶ 30.) The exercise price of employee stock options is therefore generally determined on the date they are granted, giving employees an incentive to increase their employer's stock price above its current level: If the price of their employer's stock increases, employees can exercise their options and pocket the difference between their options' exercise price and the market price of their employer's stock. Backdating options by setting their exercise price based on the lower price of the employer's stock at some earlier date gives employees an instant paper profit and thus detracts from the key purpose of the stock option grants. (Id.) Although not illegal, backdating must be accounted for correctly in a company's financial statements and properly disclosed to a company's shareholders. Principally, because granting options whose exercise price is lower than the current market price of the employer's stock ("in-the-money options") confers upon employees an immediate benefit, the amount of that benefit must be recorded on the company's financial statements as an expense, reducing income. (Id. at ¶¶ 41-42.) Not recording this expense overstates income. (Id. at ¶ 58.)

Menorah Group alleges that Comverse made four grants of backdated options to its employees that vested (*i.e.*, became exercisable) during the Class Period, under four substantially identical stock incentive compensation plans. (Id. at ¶¶ 33, 53.) These options generally vested over a four-year period. (Id. at ¶ 33.) Each of the plans gave the members of the Compensation Committee of Comverse's Board of Directors — Friedman, Oolie, and, at the time of the fourth grant of backdated options, Hiram also[3] — the authority to determine the employees that would

---

[3] Friedman had been on Comverse's Board since June 1994 and was Chairman of its Compensation Committee and a member of its Audit Committee. Oolie had served on Comverse's Board since May 1986 and was a member of both committees. Hiram had been on

3

receive option grants under the plans, the type and amount of options that the employees would receive, and the exercise prices of those options. (Id. at ¶¶ 24-26, 38.)

The members of the Compensation Committee were authorized by the Committee's charter to grant options either at a meeting or by unanimous writtten consent. (Id. at ¶ 39.) Each plan required that "incentive stock options" be granted with an exercise price not less than the closing price of Comverse's stock on the date of grant, as published by NASDAQ. (Id. at ¶ 34, 36.)[4] All options granted by Comverse should therefore have been issued with an exercise price equal to or greater than the closing price of Comverse's stock on the date that the Compensation Committee gave unanimous written consent to the option grants. (Id. at ¶ 43.)

Menorah Group alleges that, on the (at least) four occasions on which Comverse issued backdated options, Alexander and Kreinberg picked, for the purported grant date of the options, a recent date on which Comverse shares had closed at a comparatively low price. (Id. at ¶ 47.) Sorin, Comverse's General Counsel, or Alexander's assistant Fran Rail, acting at Sorin's behest, then drafted a unanimous written consent form for execution by the Compensation Committee. (Id.) These unanimous written consent forms included an "as of [date]" line that reflected the past date selected by Alexander and Kreinberg, not the date on which the forms were actually executed. The options' exercise price was equal to the closing price of Comverse's stock on that past date. (Id. at ¶ 48.)

_____

Comverse's Board between 1986 and 1987 and again since June 2001, after which time he was a member of its Compensation Committee and Chairman of its Audit Committee. (Id. at ¶¶ 24-26.)

[4] The plans also provided for the granting of "non-qualified options," which could be in-the-money on the date of grant. (Id. at ¶ 35.) However, Comverse represented that it never granted any non-qualified options. Id. The court thus need not consider this issue.

4

After communication with Alexander and Kreinberg that generally consisted of short telephone calls, Friedman, Oolie, and Hiram (for the fourth grant of backdated options) would sign the forms. (Id. at ¶¶ 197(m).) The span of time between the purported grant dates and the dates when the unanimous consent forms were signed ranged from 6 to as many as 57 days.[5] (Id. at ¶ 53.)

This backdating, as described above, was contrary to the terms of the stock option plans pursuant to which the options were issued. (Id. at ¶¶ 34, 36.) It was also concealed by Comverse's SEC filings, which represented that all stock options were granted with an exercise price equal to the fair market value of Comverse's stock on the date of grant. (Id. at ¶ 61.) In addition, the backdated options were not properly accounted for, causing a significant understatement of compensation expense and a corresponding overstatement of income, equal to approximately $192 million. (Id. at ¶¶ 58-59.)

B.    The Slush Fund

Alexander and Kreinberg also created a "slush fund," a pool of backdated stock options which they granted to Comverse employees after the Compensation Committee had already approved grants for the year. (Id. at ¶ 54.) These options were granted contrary to the terms of Comverse's stock option plans, which gave the Compensation Committee sole authority to determine stock option recipients. (Id. at ¶ 38.) In 1999, Alexander and Kreinberg created this

_____

[5] 3,109,473 options whose purported grant date was January 28, 1998 were actually granted on February 29, 1998 (22 days later). 744,000 options whose purported grant date was October 9, 1998 were actually granted on October 15, 1998 (6 days later). 3,834,333 options whose purported grant date was October 18, 1999 were actually granted on November 23, 1999 (36 days later). 9,446,407 options whose purported grant date was October 22, 2001 were actually granted on December 18, 2001 (57 days later). Id. at ¶ 53.

slush fund by including fictitious names on the list provided to the Compensation Committee. All of these fictitious recipients were listed as residing at a single address, that of Fran Rail, Alexander's assistant. (Id. at ¶ 54.) The options granted to these fictitious recipients were later reassigned to actual Comverse employees. (Id. at ¶ 56.) In 2000, Alexander and Kreinberg simply added 250,000 to the total number of options listed on the unanimous consent forms executed by the Compensation Committee, which they then placed into the slush fund. (Id. at ¶¶ 54-56.)

### C. The Additional Accounting Claims

On November 14, 2006, after the options-backdating scheme at Comverse had been uncovered, Comverse issued a press release disclosing additional accounting improprieties. (Id. at ¶ 171.) The press release disclosed that, as a result of the investigation by the Special Committee looking into Comverse's stock option practices, Comverse had " identified errors in the recognition of revenue related to certain contracts, errors in the recording of certain deferred tax accounts, and the misclassification of certain expenses in earlier periods." (Id.) In addition, the press release disclosed that other "areas of financial reporting under investigation include the possible misuse of accounting reserves and the understatement of backlog in fiscal 2002 and prior periods." (Id. at ¶ 172.) Menorah Group's claims against Defendants relating to these additional accounting improprieties will be referred to as the "Additional Accounting Claims."

## II. MENORAH GROUP'S CLASS ACTION CLAIMS AND JUDGE REYES'S RECOMMENDATIONS

### A. Menorah Group's Class Action Claims

In its Complaint, Menorah Group originally presented five claims for relief. As it has not

objected to Judge Reyes's recommendation that its Counts IV and V be dismissed, Menorah Group has waived further judicial review of Judge Reyes's recommendations on those counts, and those recommendations are therefore adopted. The court will discuss below only Counts I through III of Menorah Group's Complaint, as well as the parties' objections to the recommendations relating thereto.

Count I alleges that Defendants violated SEC Rule 10b-5(b) by fraudulently making, or causing Comverse to make, materially false and misleading statements. (Id. at ¶¶ 193-202.) Count II alleges that Sorin violated SEC Rules 10b-5(a) and 10b-5(c) by approving and improperly accounting for backdated stock options.[6] (Id. at ¶¶ 203-07.) Count III alleges that Alexander, Kreinberg, Sorin, Friedman, Oolie, and Hiram violated Section 20(a) of the Securities Exchange Act of 1934 by causing Comverse to make various materially false and misleading public statements. (Id. at ¶¶ 208-16.)

### B. Judge Reyes's Recommendations

Judge Reyes, besides recommending that Counts IV and V be dismissed against all Defendants (R&R at 44-47), recommended that the court (1) deny Alexander, Kreinberg, and Sorin's motions to dismiss the Complaint for Menorah Group's failure to timely perfect service upon them and grant Menorah Group leave to re-serve the Complaint upon Alexander, Kreinberg, and Sorin (R&R at 30, 35); (2) dismiss Counts I and II against Friedman, Oolie, and Hiram for failure to meet the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") (R&R at 40); (3) deny Comverse's motion to dismiss the Additional

---

[6] Menorah Group does not object to Judge Reyes's recommendation that Count II should be dismissed as against Friedman, Oolie, and Hiram.

Accounting Claims for failure to meet the pleading requirements of the PSLRA and Fed. R. Civ.

P. 9(b) (R&R at 43); (4) dismiss Count III against Friedman, Oolie, and Hiram for failure to

plead "culpable participation" (R&R at 44); (5) deny Friedman and Oolie's motion to dismiss

Counts II and III for Menorah Group's lack of standing (R&R at 48);[7] (6) deny Comverse's

motion for partial dismissal of Count I for claims arising after April 17, 2006 (R&R at 53); and

(7) deny Sorin, Friedman, Oolie, and Hiram's motions to partially dismiss Counts I, II, and III as

time-barred (R&R at 55).

### III.    MENORAH GROUP'S OBJECTIONS TO THE R&R

#### A.    Menorah Group's Count I as to Defendants Friedman, Oolie, and Hiram

Menorah Group objects to Judge Reyes's recommendation that the court dismiss, as to

Friedman, Oolie, and Hiram, Count I of its Complaint, which alleges that Defendants violated

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5(b) of

the regulations promulgated thereunder, 17 CFR § 240.10b-5(b), for failure to meet the

heightened pleading requirements of the PSLRA. (Lead Plaintiffs' Limited Objection to the

October 31, 2007 Report and Recommendation ("Menorah Obj.") (Docket Entry # 146) at 11.)

To state a claim under Section 10(b) and Rule 10b-5(b), a "plaintiff must plead that the

defendant, in connection with the purchase or sale of securities, made a materially false statement

or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action

caused injury to the plaintiff." Ganino, 228 F.3d at 161. The required scienter can be

demonstrated "either (a) by alleging facts to show that defendants had both motive and

---

[7] Friedman and Oolie do not object to this recommendation. (Response of Defendants John Friedman, Sam Oolie, and Ron Hiram to Lead Plaintiffs' Limited Objections to the Report and Recommendation (Docket Entry # 148) at 1.)

opportunity to commit fraud or (b) by alleging facts that constitute . . . evidence of conscious misbehavior or recklessness." Id. at 168-69. Because Menorah Group's Rule 10b-5(b) claim requires a showing of scienter, it is subject to the heightened pleading requirements of the PSLRA, which requires the plaintiff "to state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

In Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007), the Supreme Court established the following procedure that a court must follow when faced with a Rule 12(b)(6) motion to dismiss a Section 10(b) action. First, the court must accept all factual allegations in the complaint as true and must also consider other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions, "in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. at 2509. Then, to determine whether the facts in the complaint and in these other sources give rise to a strong inference of scienter, the court must ask whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 2510. The court must be careful to consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 2509 (emphasis in original).

Menorah Group has alleged both that Friedman, Oolie, and Hiram had motive to commit fraud and that they acted recklessly.

### 1.    *Motive and Opportunity to Commit Fraud*

To show motive to commit fraud, Menorah Group points out that Friedman, Oolie and

Hiram made substantial profits during the Class Period by selling Comverse shares and that they held Comverse stock options. Thus, they would benefit from any inflation in the price of Comverse's stock. (Menorah Obj. at 16.) These allegations are plainly insufficient to meet Menorah Group's pleading burden, for "the mere desire to increase . . . compensation or stock prices does not give rise to a 'strong inference' of fraudulent intent because such desires are omnipresent, and can as easily be a sign of simple ambition or run-of-the-mill greed as of fraud." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007).

## 2. *Recklessness*

Menorah Group alleges that Friedman, Oolie, and Hiram acted "egregiously" recklessly by failing to undertake the minimal inquiry required to uncover the backdating scheme. (Menorah Obj. at 12.)

Recklessness is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Rolf v. Blyth, Eastman Dillon & Co., Inc., 570 F.2d 38, 47 (2d Cir. 1978) (citation and internal quotation marks omitted).

Judge Reyes found that although there were red flags "glaringly suggestive of fraud" in the unanimous consent forms that Friedman, Oolie, and Hiram signed, and although these red flags suggested that Comverse's SEC filings were false, Friedman, Oolie, and Hiram's membership in a committee with oversight responsibilities was not sufficient to give rise to an inference of recklessness. (R&R at 39.) He found it plausible that the "simple, ministerial task of signing unanimous consent forms" would not have alerted Friedman, Oolie, or Hiram to the

10

fraud and found that it was more likely that Alexander, Kreinberg, and Sorin "actively hid the alleged backdating scheme from Friedman, Oolie, and Hiram." (R&R at 40.)

I agree that the facts alleged by Menorah Group do not give rise to an inference that Alexander, Kreinberg, or Sorin disclosed the backdating scheme to Friedman, Oolie, and Hiram. Sorin, for example, stated in his plea allocution that "I . . . did not share my knowledge with the board of directors and auditors of the company." (Declaration of Seth T. Taube ("Taube Decl.") (Docket Entry # 150), Exhibit I at 21 (Plea Allocution of William F. Sorin).) However, these facts fail to give rise to a strong inference that Alexander, Kreinberg, and Sorin successfully prevented the nature of their fraudulent scheme from becoming obvious to Friedman, Oolie and Hiram. See Rolf, 570 F.2d at 47. Significantly, Menorah Group has not alleged any facts that would give rise to an inference that Alexander, Kreinberg, or Sorin took any actions to conceal the backdating scheme as a whole, as opposed to the slush fund, from Friedman, Oolie, and Hiram.

Friedman, Oolie, and Hiram were members of the Compensation and Audit Committees of Comverse's Board of Directors and therefore likely had significant familiarity with the accounting rules applicable to stock options, including the requirement that the grant of in-the-money stock options reduce a company's income to the extent that it confers an immediate paper profit upon recipients. In addition, the terms of the incentive plans which Friedman, Oolie and Hiram were charged with administering, and which they presumably read, clearly indicated that they were not empowered to grant incentive stock options with an exercise price less than the

11

closing price of a share of Comverse's stock on the date of grant, as published by NASDAQ.[8]
See supra text at 4. It is likely, therefore, that Friedman, Oolie and Hiram noticed that something
was amiss when they signed the unanimous consent forms with the "as of [date]" lines that
reflected purported grant dates 6-57 days in the past.

Moreover, Friedman, Oolie, and Hiram each sold Comverse stock and held Comverse
stock options during the Class Period. As a result, they had firsthand knowledge as shareholders
of the ups and downs in Comverse's stock price, which makes it likely that they were aware that
the "as of" dates on the unanimous consent forms they signed corresponded to low points in
Comverse's stock price. (Compl. at ¶¶ 24-26; Declaration of Shaheen Rushd in Support of Lead
Plaintiffs' Limited Objection to the October 31, 2007 Report and Recommendation (Docket
Entry # 147), Exhibits C-E (Form 4's showing Comverse shares and options owned by Friedman,
Oolie, and Hiram).)

In their defense, Friedman, Oolie, and Hiram claim that the phrase "date of grant" is
actually more ambiguous than it seems in hindsight, and that in certain cases it may mean a date
prior to the date that all corporate action required to grant the options is complete. For instance,
if an options grant was decided with finality, but only "unimportant delays in administrative
procedures to document the grant" delayed actual corporate approval of the grant, the earlier date
might be the proper "date of grant." (Response of Defendants John Friedman, Sam Oolie, and

---

[8] Friedman, Oolie, and Hiram claim that the incentive plans did not vest the
Compensation Committee with authority to set the exercise price of incentive stock options,
because the plans required that the exercise price of incentive stock options be no less than the
"Fair Market Value of a share of Common Stock on the date of grant." (Response of Defendants
John Friedman, Sam Oolie, and Ron Hiram to Lead Plaintiffs' Limited Objections to the Report
and Recommendation (Docket Entry # 148) at 4.) The Compensation Committee, however,
could clearly grant incentive stock options with an exercise price above fair market value.

Ron Hiram to Lead Plaintiffs' Limited Objections to the Report and Recommendation ("F-O-H Resp.") (Docket Entry # 148) at 12; Taube Decl., Exhibit J (letter from SEC Chief Accountant describing exceptions to general definition of "date of grant").) Friedman, Oolie, and Hiram, however, have not pointed to any facts properly before me which would support an inference that they actually knew that the definition of "date of grant" for the purposes of accounting rules did not always have a straightforward application and that they actually thought that the dates selected by Alexander and Kreinberg corresponded to some significant corporate action of Comverse, and therefore that the "as of [date]" lines on the unanimous consent forms were likely not indicative of wrongdoing.[9]

Hiram argues that, since he only served on Comverse's Compensation and Audit Committees beginning in June 2001 and therefore only signed the last of the four unanimous consent forms at issue here, Menorah Group's allegations as to his scienter are particularly weak. (F-O-H Resp. at 2; see Compl. at ¶¶ 25, 53.) The unanimous consent form that Hiram signed "as of" October 22, 2001, however, authorized the grant of 9,446,407 options, more than half the total number of options at issue here. Moreover, the difference between the "as of [date]" on the

---

[9] Friedman, Oolie, and Hiram's argument implies that they were so familiar with the accounting of stock options that they knew that "date of grant" did not always have a straightforward meaning and that there were circumstances in which some corporate action other than the actual grant of the options determined the "date of grant" for accounting purposes.

This argument actually cuts against Friedman, Oolie, and Hiram on the question of whether it is likely that they acted recklessly; for, if Friedman, Oolie, and Hiram were actually so familiar with stock option accounting rules, it would have been even more obvious to them that something was wrong with the unanimous consent forms, because they reflected no corporate action that was taken on the "as of" date reflected on the forms.

It is possible that Friedman, Oolie, and Hiram asked Comverse's management about the "as of" dates on the unanimous consent forms, and that they were assured by Comverse's management of the propriety of Comverse's stock option practices. The record as it now stands, however, does not make such an inference plausible.

unanimous consent form and the actual date of grant was 56 days, the longest delay of all the forms. In addition, Hiram served as chair of Comverse's Audit Committee (Compl. at ¶ 25.) and was therefore presumably quite familiar with accounting rules.

Plaintiffs, moreover, have drawn the court's attention to an opinion in a related lawsuit, Stone ex rel. Ulticom, Inc. v. Osborne, 2007 WL 2085354 at *2 (D.N.J. July 16, 2007), of which the court takes judicial notice as a public record. See Rothman v. Gregor, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a complaint in a related lawsuit as a public record). The Ulticom opinion reveals that the plaintiffs in that action alleged that Hiram was a member of the Stock Option Committee at Ulticom, a subsidiary of Comverse. A complaint in a related lawsuit now pending before this court, SEC v. Alexander, 06-cv-3844, of which the court also takes judicial notice, reveals that the procedure for granting options at Ulticom was substantially similar to that at Comverse. Thus Hiram allegedly signed unanimous consent forms at Ulticom with "as of [date]" lines similar to those he signed at Comverse. See id., Complaint (Docket Entry # 1) at ¶ 110 ("[t]he terms of Ulticom's plans are substantially similar to" Comverse's stock option plans); id. at ¶¶ 117-18 (options at Ulticom were granted using unanimous consent forms copied from those used at Comverse); id. at ¶ 121 (describing three backdated option grants at Ulticom). Hiram's claim of limited exposure to options backdating is therefore weak.

I therefore find that the "red flags" evident on the face of the unanimous consent forms, coupled with Friedman, Oolie, and Hiram's likely experience and knowledge, make it at least as plausible that Friedman, Oolie, and Hiram were aware of, but ignored, a strong likelihood of wrongdoing when they signed the unanimous consent forms than that they were merely negligent

14

and unaware that a fraud was being committed.[10] The facts alleged by Menorah Group therefore give rise to a "strong inference" that Friedman, Oolie, and Hiram acted recklessly—that is, that the danger that they were committing fraud by signing the unanimous consent forms was "so obvious that [they] must have been aware of it." Rolf, 570 F.2d at 47.

B.    Menorah Group's Section 20(a) Claim

Menorah Group objects to Judge Reyes's recommendation that I dismiss its claim in Count III of its Complaint that Friedman, Oolie, and Hiram violated Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a).  (Menorah Obj. at 20.)

Section 20(a) may be used to impose joint and several liability upon a person who controls another person who violates Rule 10b-5(b) or certain other provisions of the securities laws.  Section 20(a) calls the person who directly violates Rule 10b-5(b) the "controlled person" or "primary violator"; the "primary violator" is said to have committed a "primary violation." 15 U.S.C. § 78t(a).

To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator of the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Communications v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).  Judge Reyes found that "Menorah Group has failed to sufficiently allege that Friedman, Oolie, or Hiram knew or should

_____

[10] Friedman, Oolie, and Hiram cite Weiss v. Amkor Technology, Inc., 2007 WL 2808224 at *10 (D. Ariz. Sep. 25, 2007) for the proposition that membership on a compensation committee, without more, is an insufficient basis upon which to establish scienter.  Here, however, there are particularized allegations showing what information was presented to Friedman, Oolie, and Hiram and what specific actions they took in response to that information. In re Mercury Interactive Corp. Securities Litigation, 2007 WL 2209278 at *10 (N.D. Cal. July 30, 2007) is similarly distinguishable.

15

have known that the other named defendants were engaged in fraud" and therefore concluded that Menorah Group had not met its burden to show that Friedman, Oolie, and Hiram were "culpable participants" in the options-backdating scheme. (R&R at 43-44.)

Friedman, Oolie, and Hiram concede in their brief that if Menorah Group has adequately alleged that they possessed scienter in Count I, it has also adequately pleaded the "culpable participation" required by ATSI. F-O-H Resp. at 21 n.12 ("It follows, therefore, that culpable participation *is* the same as scienter" (emphasis in original).) Menorah Group has therefore met its burden of pleading culpable participation. See supra text at 14-15 (Menorah Group adequately alleges in Count I that Friedman, Oolie, and Hiram possessed scienter.)

### IV. DEFENDANTS' OBJECTIONS

#### A. Service of process on Alexander, Kreinberg, and Sorin

Alexander, Sorin, and Kreinberg object to Judge Reyes's recommendation that I deny their motions to dismiss Menorah Group's amended complaint for insufficiency of service of process and that I grant Menorah Group leave to re-serve the complaint on Alexander, Kreinberg, and Sorin. (Jacob ("Kobi") Alexander's Objections to the Magistrate Judge's Report and Recommendation ("Alexander Obj.") (Docket Entry # 152) at 1; Defendant David Kreinberg's Objections to the Magistrate Judge's Report and Recommendation ("Kreinberg Obj.") (Docket Entry # 149) at 1; Defendant William F. Sorin's Objections to the Magistrate Judge's Report and Recommendation ("Sorin Obj.") (Docket Entry # 154) at 5; see R&R at 22.)

#### 1. *Kreinberg and Sorin*

Rule 4(m) of the Federal Rules of Civil Procedure provides that service of the summons and complaint must be made upon a defendant within 120 days of the filing of the complaint.

Failure to timely serve process, however, does not automatically result in dismissal. There is both a "good cause" and a "discretionary" exception allowing extension of the time for service. First, if the plaintiff shows good cause for the failure to timely file, the court must "extend the time for service for an appropriate period." Second, even if no good cause is shown, the court may in its discretion "direct that service be effected within a specified time." Fed. R. Civ. P. 4(m).

Neither Kreinberg nor Sorin was properly served in any of the five actions now consolidated before me. In fact, none of the five original plaintiffs ever attempted to serve Sorin, and Menorah Group has conceded that service on Kreinberg was defective. (Lead Plaintiff's Omnibus Memorandum of Law in Opposition to Defendants' Objections to the Report and Recommendation ("Menorah Omn. Mem.") (Docket Entry # 143) at 27.) However, Judge Reyes found good cause for the delay in serving process on Kreinberg and Sorin, in part because Menorah Group was selected as lead plaintiff only after Rule 4(m)'s 120-day period had already ended. (R&R at 32-33.) Judge Reyes also recommended that, even in the absence of good cause, discretionary relief was warranted. (R&R at 33.)

Because I agree with Judge Reyes that discretionary relief is warranted under the circumstances of this case, I will not address whether Menorah Group has shown good cause for its failure to timely serve Kreinberg and Sorin.

Some relevant factors to be considered in determining whether to grant discretionary relief to a plaintiff for failure to timely serve a defendant include: "(1) whether the applicable statute of limitations would bar the refiled action; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the defendant had attempted to conceal the

17

defect in service; and (4) whether the defendant would be prejudiced by the granting of plaintiff's request for relief . . . ." Eastern Refractories Co. v. Forty Eight Insulations Inc., 187 F.R.D. 503, 506 (S.D.N.Y. 1999).

Menorah Group would suffer significant prejudice if discretionary relief were not granted, because the statute of limitations would bar a substantial portion of its claims if its Complaint were now to be dismissed and refiled. The options backdating scheme apparently came to an end around October 2001. (Compl. at ¶ 47.) Assuming a five-year limitations period, see infra text at 32, many of Menorah Group's claims arising out of Comverse's options-backdating activity might be time-barred, and it is possible that only misleading statements issued after the beginning of 2003 would still be actionable. See infra text at 33-34 (discussing whether the "continuing violations doctrine" applies to render actionable backdating activity preceding the beginning of the five-year limitations period). The first factor, therefore, weighs heavily in favor of granting discretionary relief.

Neither Kreinberg nor Sorin argues that they did not have actual notice of the claims in the complaint, and therefore the second factor also weighs in favor of granting discretionary relief. The third factor weighs in favor of dismissal, because Menorah Group does not allege that Kreinberg or Sorin attempted to conceal a defect in service. The fourth factor, however, weighs in favor of granting discretionary relief, because neither Kreinberg nor Sorin would be prejudiced by a grant of discretionary relief. See Almonord v. Kingsbrook Jewish Med. Ctr., 2007 WL 232496 at *13 (E.D.N.Y. August 10, 2007) (applying this four factor test).

Additional circumstances present here also weigh in favor of granting discretionary relief. The PSLRA provides that the determination of a lead plaintiff in a securities class action may not

18

be made by the district court until any motion to consolidate that action with other actions is decided. 15 U.S.C. § 78u-4(a)(3)(B)(ii). Because of this provision, and because of other delays inherent in the judicial process, a lead plaintiff in a securities class action may not be selected until the 120-day period provided for in Rule 4(m) is already over. Here, for example, Menorah Group was not selected as lead plaintiff until nearly a year after the initial filing of this case. (R&R at 24.) The uncertainty and delay inherent in the determination of lead plaintiff unfortunately diffuses responsibility, as no one party knows that it will have eventual responsibility for the class action until after certain procedural deadlines, like Rule 4(m)'s 120-day period, have already passed. Although this circumstance might not be sufficient to excuse defective service on its own, it does weigh in favor of granting discretionary relief, especially as Menorah Group attempted to remedy defects in the service of process after it was named as lead plaintiff. (R&R at 33.)

On balance, considering all the facts and circumstances, I find that discretionary relief pursuant to Rule 4(m) is warranted and that Menorah Group's service of its amended complaint on Kreinberg in June 2007 and on Sorin in April 2007 was timely. (R&R at 31.)

## 2. *Alexander*

Judge Reyes determined that, like Kreinberg and Sorin, Alexander was not properly served in any of the original actions now consolidated before me. (R&R at 22.) However, since Alexander resided outside the United States, Judge Reyes found that Rule 4(m) and its 120-day deadline for service of process did not apply, since Rule 4(m) states that "[t]his subdivision does not apply to service in a foreign country pursuant to subdivision (f) . . . ." (R&R at 23.) Judge Reyes therefore applied the standard applicable under Rule 4(f), pursuant to which service is

timely if the plaintiff was duly diligent in attempting to serve the defendant. Standard Commercial Tobacco Co. v. Mediterranean Shipping Co., 1995 WL 753901 at *1 (S.D.N.Y. Dec. 19, 1995). Because he found that Menorah Group acted with due diligence, Judge Reyes recommended allowing re-service of the complaint upon Alexander. Judge Reyes further recommended ordering Menorah Group to re-serve the amended complaint on Alexander by hand delivery to his New York City apartment and by certified mail to his attorneys. (R&R at 24-25, 30.)

Alexander correctly argues that the 120-day time limit in Rule 4(m) does apply to him, because the Rule 4(f) "exception does not apply if, as here, the plaintiff did not attempt to serve the defendant in the foreign country." USHA (India), Ltd. v. Honeywell Int'l, Inc., 421 F.3d 129, 134 (2d Cir. 2005). (Reply Memorandum of Law in Further Support of Jacob "Kobi" Alexander's Objections to the Magistrate Judge's Report and Recommendation ("Alexander Rep. Mem.") (Docket Entry # 153) at 2.)

Since Rule 4(m)'s 120-day time limit applies to Alexander, the same analysis applied above to Kreinberg and Sorin also applies to Alexander. The same factors considered above weigh in favor of extending discretionary relief to allow late service upon Alexander as well. In fact, additional factors present here further support a grant of discretionary relief as to Alexander. First, Alexander's lawyers electronically filed notices of appearance and attended a telephone conference in this action without disclosing the defects in service, and were therefore not forthright in notifying Menorah Group's predecessors of the defective service.[11] (Alexander Rep.

---

[11] Alexander correctly points out that a defendant does not waive challenges to service until he files a responsive pleading and is not required to "sound the alarm" against his interests on a claim for which the statute of limitations is about to expire. (Alexander Rep. at 5-6.) This

Mem. at 5.) Second, Alexander's behavior in the months after the original complaints were filed — escaping the jurisdiction of the federal government, first to Israel and then to Namibia — did not facilitate — indeed, it obfuscated — the plaintiffs' efforts to serve him in the original actions. United States v. All Funds on Deposit at Citigroup Smith Barney Account No. 600-00338 Held in the Name of Kobi Alexander, 2007 WL 2687660 at *2 (E.D.N.Y. Sep. 10, 2007).

I therefore adopt Judge Reyes's proposal and approve the service made in November, 2007 upon Alexander by hand delivery to Alexander's apartment in New York City and by certified mail to Alexander's attorneys.[12] (Id.; Menorah Obj. at 2 (notifying the court that Menorah Group has already re-served Alexander).)

B.    Comverse's objection regarding the April 17, 2006 disclosure

Comverse has moved for a partial dismissal of Menorah Group's Section 10(b) claim with respect to all purchases of Comverse stock after April 17, 2006, when Comverse issued a press release warning investors that its historical financial statements should no longer be relied upon and would need to be restated. Comverse, joined by the other Defendants, now objects to Judge Reyes's recommendation that the court deny its motion for partial dismissal. (Defendant Comverse Technology, Inc.'s Objections to the Magistrate Judge's Report and Recommendations ("Comverse Obj.") (Docket Entry # 141) at 2-3; Alexander Rep. Mem. at 2; Sorin Obj. at 2; Kreinberg Obj. at 1; F-O-H Resp. at 1 n.1.)

---

does not mean, however, that the court may not take Alexander's conduct into account when exercising its discretion to extend the time for service. In any case, even absent Alexander's lawyers' appearances on his behalf, the court would still extend the time for service.

[12] Alexander does not object to the method of service proposed by Judge Reyes pursuant to Fed. R. Civ. P. 4(f)(3).

Comverse's April 17, 2006 press release disclosed that a Special Committee investigating stock options at Comverse, whose formation had previously been announced, would continue "to review matters relating to the Company's stock option grants, including the accuracy of the stated dates of option grants and whether all proper corporate procedures were followed." (Affidavit of Matthew L. Mustokoff in Support of Defendant Comverse Technology, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("Mustokoff Aff.") (Docket Entry # 142), Exhibit B ("April 17, 2006 Press Release").) Comverse also warned investors that the expected changes to its financials would likely be material and that its previous financial statements should no longer be relied upon. Because Comverse would not be able to timely make all required filings with the SEC, it also warned investors that it would likely receive a letter from NASDAQ warning about a possible delisting of Comverse stock. Finally, Comverse disclosed that on April 11, 2006 a shareholder derivative action had been filed by one of Comverse's shareholders against "certain executives of the Company and certain current and former members of the Company's board of directors" for allegedly breaching their fiduciary duties by "allowing and participating in a scheme to backdate the grant dates of employee stock options to improperly benefit the Company's executives and certain directors . . . ." (Id.)

On the day of and the day after this press release, Comverse's stock price fell a total of 5.3%, net of the NASDAQ Communications Index.[13] (Compl. at ¶ 159.) Subsequent disclosures were accompanied by further declines in Comverse's stock price. On May 4, 2006, after Comverse disclosed that the Department of Justice had subpoenaed documents relating to its

---

[13] Calculating the changes in Comverse's stock price net of an index of stock prices of similar companies gives a rough approximation of the change in Comverse's stock price occasioned by news specific to Comverse.

stock option grants, Comverse's stock price dropped 4.4%. (Id. at ¶ 162.) Then, on June 12, 2006, Comverse announced that, because of the Special Committee's ongoing review of its stock option grants, its 10-Q filing for the quarter ended April 30, 2006 would be delayed and it would therefore receive another delisting letter from NASDAQ. After this disclosure, Comverse's stock price dropped 8.8%, net of the NASDAQ Communications Index. (Id. at ¶ 163-64.)

In its motion to dismiss, Comverse claimed that purchasers of its stock after the April 17 Press Release could not have reasonably relied upon any prior false disclosures relating to its backdating misconduct. (Memorandum of Law in Support of Defendant Comverse Technology, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("Comverse Mem.") (Docket Entry # 97) at 10.) Comverse also claimed that its disclosures subsequent to April 17, 2006 did not disclose any materially new information and that therefore Menorah Group cannot demonstrate the required causal link between those subsequent disclosures and the accompanying drops in Comverse's stock price. (Id. at 12.)

Judge Reyes agreed with Comverse that after April 17, 2006 purchasers could no longer reasonably rely on Comverse's pre-April 17, 2006 disclosures. (R&R at 51-52.) He found, however, that the April 17, 2006 Press Release was itself misleading and that it could on its own support a valid Section 10(b) claim. (R&R at 52.)

To state a claim under Section 10(b), a plaintiff must show both transaction causation and loss causation. Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005). Transaction causation is analogous to reliance and is established "by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc., 343 F.3d 189 (2d

Cir. 2003). To prove loss causation, the plaintiff must show that the defendant's fraud, and not some other factor, actually caused the plaintiff's economic loss. Dura, 544 U.S. at 338.

1.    *Transaction Causation*

In its Complaint, Menorah Group has relied on the "fraud-on-the-market" presumption, (Compl. at ¶ 191), which, if unrebutted, allows the plaintiff to satisfy its burden to plead transaction causation. The fraud-on-the-market doctrine creates a rebuttable presumption that when a security is traded in an efficient market, "(1) misrepresentations by an issuer affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value." Hevesi v. Citigroup Inc., 366 F.3d 70, 77 (2d Cir. 2004) (citing Basic Inc. v. Levinson, 485 U.S. 244, 245-47 (1988)). The presumption can be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248. For example, the presumption would be rebutted if the defendants could show that "the 'market makers' were privy to the truth," or that news of the truth had "credibly entered the market and dissipated the effects of the misstatements." Id. at 248-49. This is known as the "truth-on-the-market" corollary to the fraud-on-the-market doctrine.

The Second Circuit has discussed the truth-on-the-market doctrine in the context of determining whether a misrepresentation is immaterial: "Under this corollary, a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market." Ganino, 228 F.3d at 167. To establish the truth-on-the-market defense, "the corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading

24

information created by the alleged misstatements." Id. (internal citation and quotation marks omitted). The Second Circuit has cautioned that the "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a Section 10(b) complaint for failure to plead materiality." Id.

Applying this formulation of the truth-on-the-market defense, I find that Menorah Group has adequately alleged that the disclosure in the April 17, 2006 Press Release may not have been intense or credible enough to "counter-balance effectively" Comverse's previous misstatements. See id. ("summary judgment based on the 'truth-on-the-market' doctrine is appropriate only if defendants show that no rational jury could find that the market was misled") (internal citation and quotation marks omitted). A fact-finder could reasonably find that in order to "counter-balance effectively" its previous misstatements, Comverse would have had to both issue restated financial statements, or an estimate thereof, and inform shareholders that its executives had engaged in deliberately fraudulent behavior. The April 17, 2006 Press Release did neither.

Semerenko v. Cendant Corp., 223 F.3d 165 (3d Cir. 2000), a case cited by Comverse, clearly illustrates the importance of issuing restated financial statements, or providing shareholders with an estimate of the likely magnitude of the expected restatement. In Semerenko, the shareholders of ABI alleged that Cendant had caused the price of ABI's stock to rise when it made an offer to purchase to ABI but then caused them economic harm when ABI's stock fell after Cendant revealed that its financial statements were false and the market lost confidence that Cendant would be able to follow through on its purchase of ABI. Id. at 169-71. Cendant claimed that transaction causation was cut off by a press release in which it warned that its previously issued financial statements should not be relied upon and that it expected that it

would have to restate its previous year's earnings by $0.11-$0.13 and its net income by $100 to $115 million. Id. at 181. The Third Circuit found that "[i]n light of the curative nature of the warning statement, and given the instantaneous decline in the market price of both companies' common stock, we conclude that the announcement immediately rendered the prior misrepresentations concerning Cendant's financial condition immaterial as a matter of law." Id.

Because Cendant clearly notified the market of the expected magnitude of its restatement, the market could set a price for Cendant's stock without relying on Cendant's prior misrepresentations concerning its financial condition.[14] The April 17, 2006 Press Release, on the other hand, gave the market no inkling of the extent of the restatement to Comverse's financial statements that would be required. Although Comverse informed its shareholders that they could no longer rely on its prior financials, it gave them no other information on which they could rely. It is therefore difficult to understand how the market could have priced Comverse's stock after the April 17, 2006 Press Release without relying on Comverse's prior financial statements because, without an estimate of the expected changes to Comverse's financial statements, investors had no way to know whether Comverse was profitable or not, and by how much.

In addition, in order to "counter-balance effectively" its prior misleading statements, a factfinder would likely find that Comverse should also have fully and fairly disclosed the nature of the misconduct that had been uncovered, for it is plainly material to investors that executives of a company are acting fraudulently. First, executives who act fraudulently may subject their employer to a risk of legal action, and may also use their employer's resources for their own

---

[14] The importance of this estimate of the restatement of Cendant's financial statements that would be required is demonstrated by the fact that the court found that the estimate's inaccuracy could form the basis for a separate 10b-5(b) action. Id. at 181.

ends, not to benefit shareholders. Second, executives who commit fraud are likely to be terminated. When those executives are valuable to a company's continued success, as Alexander, Comverse's CEO, likely was, this possibility is plainly material to investors. See Siemers v. Wells Fargo & Co., 2007 WL 1140660 at *8 (N.D. Cal. Apr. 17, 2007) (stressing the materiality to investors of information indicating management's lack of integrity).

Instead of disclosing that its senior management had engaged in extensive fraudulent activity, the April 17, 2006 Press Release mentioned only that "proper corporate procedures" may not have been followed, and that a derivative action had been filed in New York State Supreme Court alleging that Comverse's executives and directors had breached their fiduciary duties by participating in a backdating scheme. Although investors may have been able to deduce from these disclosures that Comverse's senior executives had acted fraudulently, they at most recognized that this was a possibility, not the actual truth.[15]

Therefore, it has not been established as a matter of law that the April 17, 2006 Press Release "counter-balanced effectively" Comverse's prior misleading disclosures, because it disclosed neither the nature of the misconduct at Comverse nor the expected magnitude of the restatement that would be required as a result of the options-backdating scheme.[16] Menorah

---

[15] As Defendants would likely concede, the allegations in a complaint are not presumptively true. Moreover, the disclosure that "proper corporate procedures " may not have been followed is susceptible to a variety of interpretations. The most likely interpretation, moreover, is definitely *not* that an extensive fraud was perpetrated.

[16] In re Livent, Inc. Noteholders Securities Litigation, 151 F. Supp. 2d 371, 437 (S.D.N.Y. 2001), cited by Comverse, does not require a different result. In Livent, two "vulture funds" specializing in the purchase of "distressed securities" purchased notes of Livent, a theater production company, whose principals had engaged in numerous fraudulent transactions. Judge Marrero ruled that the vulture funds could not allege transaction causation because they had purchased Livent's notes after Livent had issued various press releases that cured earlier

Group has therefore adequately pleaded transaction causation, including after the April 17, 2006 Press Release.

## 2. *Loss Causation*

As mentioned above, Comverse also argues that Menorah Group has failed to adequately allege that the harm Plaintiffs suffered as a result of drops in Comverse's stock price subsequent to the April 17, 2006 Press Release was caused by the options-backdating scheme. (Comverse Mem. at 12.)

Specifically, Comverse argues that its May 4, 2006 and June 12, 2006 announcements relating to options backdating cannot have caused Plaintiffs harm, even though they were followed by sharp drops in Comverse's stock price, because all the facts relating to the options backdating had already been made public by Comverse in its April 17, 2006 Press Release. As described above, Menorah has adequately alleged that Comverse's April 17, 2006 Press Release may not have revealed the full nature or extent of the wrongdoing at Comverse and that therefore the drops following these subsequent disclosures were likely the result of new information that reached the market concerning Comverse's earlier misrepresentations. I therefore find that

--------

misstatements. Id. at 439-40.

Livent is distinguishable first because, by virtue of their sophistication and investing experience, the vulture funds were subject to an "enhanced duty to obtain available information material to investment decisions." Id. at 439. Therefore, they could not, unlike Comverse's investors, simply rely on the market price of the notes they were buying; instead, they had to seek out information and make an independent determination of the fair market value of the notes.

Second, Livent's corrective disclosure was significantly stronger than the April 17, 2006 Press Release. It revealed the suspension of Livent's two most senior executives, as well as the existence of "serious irregularities," a significantly stronger disclosure than the April 17, 2006 Press Release's reference to the possibility that "proper corporate procedures" had not been followed. This disclosure more intensely and credibly put the market on notice of the gravity of the improper activity uncovered at Livent than did the April 17, 2006 Press Release. Id. at 390, 440.

Menorah Group has adequately alleged loss causation with respect to Comverse's May 4, 2006 and June 12, 2006 announcements.[17]

### C. Menorah Group's Additional Accounting Claims

In its motion to dismiss, Comverse, joined by the other Defendants, argued that Menorah Group's Additional Accounting Claims should be dismissed because they fail to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA. Although Comverse does not object to Judge Reyes's recommendation that Menorah Group be allowed to proceed with these claims, (Comverse Obj. at 2), the other Defendants do. (Alexander Rep. at 1; Kreinberg Obj. at 1; Sorin Obj. at 16; F-O-H. Resp. at 1 n.1.)

Menorah Group's allegations regarding its Additional Accounting Claims are derived in large part from two Comverse press releases issued on November 14, 2006 and on March 22, 2007. The November 14, 2006 press release disclosed that, in connection with the Special Committee's investigation into Comverse's employee stock option practices "the Company identified errors in the recognition of revenue related to certain contracts, errors in the recording of certain deferred tax accounts, and the misclassification of certain expenses in earlier periods." (Mustokoff Aff., Exhibit C (November 14, 2006 press release).) Comverse reported that other "areas of financial reporting under investigation include the possible misuse of accounting reserves and the understatement of backlog in fiscal 2002 and prior periods." Id.

---

[17] Comverse also argues that its November 14, 2006 announcement relating to the Additional Accounting Claims cannot have caused Plaintiffs harm because Menorah Group has not established that it has a basis for the Additional Accounting Claims. (Comverse Mem. of Law at 15.) The court is granting Menorah Group leave to amend the Additional Accounting Claims in its Complaint. It is therefore prudent to defer consideration of Comverse's argument regarding its November 14, 2006 announcement.

The March 22, 2007 press release disclosed that Phase I of the Special Committee's investigation, concerning Comverse's employee stock option practices, had substantially concluded, but that the Special Committee was continuing its Phase II investigation, announced in mid-November 2006, of the additional accounting irregularities. (Mustokoff Aff., Exhibit D (March 22, 2007 press release).) The press release disclosed that

> additional information discovered in the investigation and the subsequent reviews or audits by the company's independent registered public accounting firm may result in adjustments to the financial information presented herein, and such adjustments could be material. The company believes that the aggregate historical sales and total cash flows as previously reported are not likely to materially change. Id.

Judge Reyes found that, when viewed together with the ample evidence that Comverse's stock option accounting practices were fraudulent, it was highly plausible that Defendants (other than Friedman, Oolie, and Hiram) engaged in additional accounting irregularities "in order to cover up the backdated options and, in the process, artificially drive up Comverse's stock price." (R&R at 40, 42.) Judge Reyes cited as evidence of likely wrongdoing Comverse's warning that it would need to materially restate its financial statement as a result of these additional accounting irregularities. Judge Reyes also cited the fact that Comverse's internal investigation into the Additional Accounting Claims had already been ongoing for over a year and a half. He therefore recommended that the court deny Comverse's motion to dismiss the Additional Accounting Claims, because Comverse should not be rewarded for its failure to aggressively investigate its own wrongdoing.

Fortunately, the Special Committee has now concluded its investigation and has issued its report. (Comverse Technology, Inc. Form 8-K filed January 29, 2008, attached to letter from

Menorah Group (Docket Entry # 162) ("Special Committee Final Report").)

Under <u>Rothman</u>, 220 F.3d at 88, the court may take judicial notice of "public disclosure documents required by law to be, and that have been, filed with the SEC." The Special Committee Final Report was filed under Item 8.01, Other Events on SEC Form 8-K. Item 8.01 is described on SEC Form 8-K as follows:

> Item 8.01 Other Events
>
> The registrant may, at its option, disclose under this Item 8.01 any events, with respect to which information is not otherwise called for by this form, that the registrant deems of importance to security holders. The registrant may, at its option, file a report under this Item 8.01 disclosing the nonpublic information required to be disclosed by Regulation FD (17 CFR 243.100 through 243.103).
>
> SEC form 8-K (available at http://www.sec.gov/about/forms/form8-k.pdf).

Item 8.01 is generally used to disclose information that the registrant is not required by law to disclose, as well as information required to be disclosed by Regulation FD. Because it is not clear that disclosure of the Special Committee Final Report was required by Regulation FD, which mandates public disclosure of material nonpublic information selectively disclosed to certain classes of persons, <u>see</u> 17 C.F.R. 243.100, it is not appropriate at this time to take judicial notice of the Special Committee Final Report.[18]

However, taking into account the material new information concerning the Additional Accounting Claims disclosed by the Special Committee Final Report, as well as the policy of the Federal Rules of Civil Procedure that leave to amend a complaint should be "freely given when justice so requires," I grant Menorah Group leave to amend its Complaint to add particularized

---

[18] Indeed, it is not clear that nonpublic information required to be disclosed pursuant to Regulation FD would fall within the <u>Rothman</u> rule, because the initial disclosure triggering the disclosure obligation under Regulation FD is optional, not required by law.

allegations about the Additional Accounting Claims sufficient to meet the pleading requirements of Rule 9(b) and the PSLRA. See Fed. R. Civ. P. 15(a) (allowing amendments by leave of court); Fed. R. Civ. P. 15(c) (amendment will relate back to the date of the original pleading when "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading").

### D.    Sorin and Counts I, II, and III

In his motion to dismiss, Sorin argued that certain portions of Menorah Group's Counts I, II, and III were time-barred and should be dismissed. (R&R at 53.) Sorin, joined by Friedman, Oolie, and Hiram, now objects to Judge Reyes's recommendation that I deny his motion for partial dismissal. (See R&R at 55; Sorin Obj. at 12; F-O-H Resp. at 1 n.1)

A claim for violations of Section 10(b) (Counts I and II) or 20(a) (Count III) "may be brought not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation or (2) 5 years after such violation." 28 U.S.C. § 1658(b) (providing time limitations for the commencement of a "private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws. . .").

Because he was first named as a defendant in this case on June 12, 2006, Sorin argues that Menorah Group's claims are time-barred to the extent that they are based on acts or omissions that occurred prior to June 12, 2001.[19] Specifically, Sorin argues that Menorah Group's allegations based on Comverse's filings of April 30, 2001, May 11, 2001, and June 4,

_____

[19] Friedman, Oolie, and Hiram became parties to this action on different dates and thus argue for the imposition, as to them, of different limitations periods.

2001 are time-barred. (Sorin Obj. at 12.)

In accordance with Section 1658(b)'s focus on the particular statutory "violation" at issue, to the extent that Menorah Group's claims are based on misleading disclosures about options backdating or other accounting practices, the 5-year period specified in section 1658(b)(2) begins to run on the date of such disclosures, not on the date of grant of the backdated options. However, to the extent that Menorah Group's claims are based directly on a backdated grant of options, the 5-year period begins to run on the date the options were granted. See, e.g., In re Atmel Corp. Derivative Litig., 2007 WL 2070299 at *7 (N.D. Cal. July 16, 2007).

Menorah Group argues, however, that, pursuant to the "continuing violations doctrine," when a misleading disclosure that would otherwise be time-barred is republished, the 5-year period of repose on the original disclosure starts to run only when it is last republished. (Menorah Omn. Mem. at 38.) It argues that since the disclosures prior to June 12, 2001 were later republished, those earlier disclosures should still be actionable.

The "continuing violations doctrine" operates to delay the triggering of a statute of limitations where a continuing violation is "occasioned by continual unlawful acts, not continual ill effects from a single violation." New York v. Niagara Mohawk Power Corp., 263 F. Supp. 2d 650, 660 (W.D.N.Y. 2003). The weight of authority in this circuit is skeptical of the application of the continuing violations doctrine in securities fraud cases. See, e.g., SEC v. Jones, 2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006); de la Fuente v. DCI Telecommunications, Inc., 206 F.R.D. 369, 385-86 (S.D.N.Y. 2002) ("It is not at all clear that the continuing fraud doctrine applies in securities fraud cases."); SEC v. Caserta, 75 F. Supp. 2d 79, 89 (E.D.N.Y. 1999); Stoll v. Ardizzone, 2007 WL 2982250 at *2 (S.D.N.Y. Oct. 9, 2007) ("there is no 'continuing violations'

33

exception to the absolute bar of the statutory limitations period"). <u>But see</u> <u>In re Dynex Capital</u> <u>Sec. Litig.</u>, 2006 WL 314524 at *5 (S.D.N.Y. Feb. 10, 2006) (where a "series of fraudulent misrepresentations is alleged, this period of repose begins when the last alleged misrepresentation was made" (citation and internal quotation marks omitted)).

I believe that it would be prudent to defer consideration of this issue until the factual record here is more fully developed, for two reasons. First, because this is an uncertain area of the law, the court desires, before making a determination, as complete a factual record as possible. This is especially so as it is difficult to determine at this point whether the factual predicate required for application of the continuing violations doctrine — the commission of continual unlawful acts — has been met here. Second, because the Additional Accounting Claims will likely present a similar issue, the court would like to have in hand Menorah Group's amended Additional Accounting Claims, as well as a fuller factual record relating thereto, before the court makes a legal determination that will likely affect both the options-backdating claims and the Additional Accounting Claims.

## V.    CONCLUSION

For the reasons stated above, (1) Counts IV and V are DISMISSED as against all Defendants and Count II is DISMISSED as against Friedman, Oolie, and Hiram; (2) Friedman, Oolie, and Hiram's motions to dismiss Counts I and III of the Complaint are DENIED; (3) Alexander, Kreinberg, and Sorin's motions to dismiss the Complaint for defective service are DENIED, and Menorah Group's service on Alexander in November, 2007, on Kreinberg in June, 2007, and on Sorin in April, 2007 is accepted as proper and timely; (4) Defendants' motions for partial dismissal of the Complaint's options-related claims with respect to purchases after April

17, 2006 are DENIED; (5) Defendants' motions for partial dismissal of the Complaint's

Additional Accounting Claims are DENIED and Menorah Group is GRANTED 10 days leave to

amend the portion of its Complaint that relates to those claims; and (6) Sorin's motion for partial

dismissal of Menorah Group's Counts I, II, and III and Friedman, Oolie, and Hiram's motions for

partial dismissal of Counts I and III as time-barred are DENIED without prejudice, with leave to

renew at a later date upon a fuller factual record.

SO ORDERED.

Dated: February 19, 2008
    Brooklyn, N.Y.

/signed/

NICHOLAS G. GARAUFIS
United States District Judge