UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
IN RE COMVERSE TECHNOLOGY, INC.
SECURITIES LITIGATION

**MEMORANDUM AND ORDER**

06-CV-1825 (NGG) (RER)

----------------------------------------------------------X
NICHOLAS G. GARAUFIS, U.S. District Judge.

In this consolidated securities class action, lead plaintiffs Menorah Insurance Co. Ltd. and Mivtachim Pension Funds, Ltd. (collectively, "Menorah Group") allege, inter alia, that Defendant William F. Sorin ("Sorin"), formerly the General Counsel of Defendant Comverse Technology, Inc. ("Comverse"), is liable under Rule 10b-5 and Sections 10(b) and 20(a) of the Securities Exchange Act for his involvement in (1) an options-backdating scheme and (2) additional accounting manipulations at Comverse. (Revised Second Consolidated Amended Complaint for Violations of Federal Securities Laws ("Revised Complaint") (Docket Entry # 174) ¶¶ 215-38.) Sorin now moves to dismiss Menorah Group's claims relating to the additional accounting manipulations, but not to the options-backdating scheme. For the reasons stated below, Menorah Group's claims relating to the additional accounting manipulations are DISMISSED as against Sorin.

I.   **FACTUAL AND PROCEDURAL BACKGROUND**

Menorah Group alleges that Sorin was involved in an options-backdating scheme at Comverse, which was described at length in the court's February 19, 2006 Memorandum and Order, familiarity with which is assumed. See In re Comverse Tech., Inc. Sec. Litig., 543 F. Supp. 2d 134 (E.D.N.Y. 2008) ("Comverse I"). Menorah Group also alleges, in the claims this court has called the "Additional Accounting Claims," that Sorin was involved in, or acted recklessly with respect to, a scheme to inflate Comverse's share price through various improper

accounting manipulations ("Additional Accounting Manipulations"). These manipulations allegedly involved "misuse of reserves, manipulations of backlog, premature recognition of revenue, improper classification of certain expenses, and improper treatment of tax deferral accounts." (Revised Complaint ¶ 62.)

In Comverse I, the court granted Menorah Group leave to amend its Complaint to add particularized allegations about the Additional Accounting Manipulations to meet the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 109 Stat. 737, and Fed. R. Civ. P. 9(b). Comverse I, 543 F. Supp. 2d at 154. Sorin now argues that the allegations in Menorah Group's Revised Complaint about his involvement in the Additional Accounting Manipulations still do not meet those pleading requirements.

Those allegations, which the court accepts as true for the purpose of deciding Sorin's motion, are as follows:

Sorin was Comverse's General Counsel from October 1984 until his resignation on May 1, 2006. (Revised Complaint ¶ 26.) From 1994 through 2001, Sorin received more than $2.5 million in legal fees from Comverse. (Id. ¶ 26.) Between April 30, 2001 and November 14, 2006, Sorin also served as Comverse's Corporate Secretary and as one of its Directors. (Id. ¶¶ 1, 26.) Sorin was a "close confidante" of Jacob "Kobi" Alexander ("Alexander"), Comverse's Chairman and Chief Executive Officer, and of David Kreinberg ("Kreinberg"), Comverse's Chief Financial Officer and Vice President of Finance. (Id. ¶¶ 24-25, 219(n)). Sorin also received 114,500 backdated stock options and realized a gain traceable to the options-backdating scheme of $1,900,990. (Id. ¶ 56.)

On November 2, 2006, Sorin pled guilty to a one-count felony information charging him

with conspiracy to commit securities fraud, mail fraud, and wire fraud. (Id. ¶ 176.) According to a Department of Justice press release quoted by Menorah Group in its Revised Complaint, Sorin

> admitted that he conspired with Alexander . . . to conceal that Comverse stock option grants were being backdated to dates when the stock was trading at periodic low points. Sorin also admitted that he approved false proxy statements and SEC filings that failed to properly account for the backdated options as compensation expense.

(Id.)

Sorin drafted, or had another individual draft, unanimous consent forms with backdated "as of" dates that were then executed by the members of the Compensation Committee of Comverse's Board of Directors. (Id. ¶¶ 50-51.) Sorin also drafted and approved Comverse's proxy statements, its annual and quarterly SEC filings, and its stock option plans. (Id. ¶ 219(i).)

The report of the special committee created to review the options-backdating scheme at Comverse (the "Special Committee") states that

> between 1991 and 2001, almost 54 million stock options . . . were backdated to obtain advantageous exercise prices, with the knowledge and participation of the Company's former Chairman and Chief Executive Officer Jacob "Kobi" Alexander, the Company's former director and General Counsel, William Sorin and, at times, the Company's former Executive Vice President and Chief Financial Officer, David Kreinberg.

(Declaration of Solomon N. Klein (Docket Entry # 188) Exh. C ("Report") at 3.)[1] The Report

---

[1] The Special Committee was formed on March 10, 2006. With respect to its investigation of the options-backdating scheme, the Special Committee retained the law firm of Dickstein Shapiro LLC to serve as its counsel. Dickstein Shapiro LLP then retained a forensic accounting and litigation support firm and an Israeli law firm to assist with Israeli law issues. The investigation involved 131 interviews of 117 present and former Comverse officers, directors, and employees, as well as the collection and review of electronic and paper documents. All in all, more than 200,000 pages of documents were delivered to the Securities and Exchange Commission ("SEC") and to the United States Attorney, both of which were informed of the progress of the investigation. (Id. at 7-8).

With respect to its investigation of the Additional Accounting Manipulations, the Special

also reveals the Special Committee's finding that Comverse's financial results were "intentionally misstated as a way of aligning the Company's performance with Wall Street expectations" and "to portray Comverse as a company with steady, measured growth." (Id. at 5.) The Report describes in great detail the involvement of Alexander and Kreinberg in these Additional Accounting Manipulations. For example, the Report states that Kreinberg "routinely overrode existing controls . . . to make unsupported quarter-end adjustments [to create] excess reserves that later could be (and were) released into income" and to reclassify certain expenses to present "more consistent operating and performance trends." (Id. at 5.) Kreinberg "repeatedly made unsupported downward adjustments to the Company's sales backlog" and, at Alexander's direction, made "adjustments to quarter-end reserve accounts to create desired earnings per share." (Id. at 6, 16.)

Comverse's finance operations were overseen by Kreinberg who, together with Alexander, "was able to sidestep the formal lines of reporting that had been established." (Id. at 18.) The Report describes in great detail the methods Kreinberg used in order to carry out the Additional Accounting Manipulations. Every quarter, Kreinberg would hold a telephone conference in which he "dictated adjustments . . . increasing or decreasing reserves." (Id.) To keep track of these adjustments, Kreinberg maintained a spreadsheet with a hidden column that

---

Committee devised a "comprehensive work plan to test areas of possible financial manipulation for the fiscal periods 1996 through January 31, 2006." (Id. at 17.) This work plan was reviewed by Deloitte & Touche LLP, Comverse's auditors, and vetted by the SEC and the United States Attorney. Over the course of the investigation, 2,000 computer back-up tapes were restored and more than 2,000,000 documents were collected. More than 1,000,000 documents were reviewed. The Special Committee conducted 58 formal interviews of Comverse personnel, as well as of employees of Deloitte & Touche LLP, Comverse's auditor. In addition, forensic accountants retained by the Special Committee spoke with Comverse personnel "with respect to specific entries on [Comverse's] books." (Id.)

represented the amount of excess reserves that could be taken back into income in order to smooth out Comverse's earnings. (Id.) Every quarter, Kreinberg would also direct Comverse's Finance Department to reclassify expenses between Cost of Goods Sold, Research and Development and Selling, General and Administrative Expenses so as to show "an even growth rate across categories." (Id. at 19.)

The Report concluded that Alexander, Kreinberg, and Sorin were engaged in intentional misconduct with respect to the options-backdating scheme, but that only Alexander and Kreinberg engaged in intentional misconduct as to the Additional Accounting Manipulations. (Id. at 22.)

## II. LEGAL STANDARD

Under the PSLRA, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007), the Supreme Court established the following procedure that a court must follow when faced with a Rule 12(b)(6) motion to dismiss a Section 10(b) action. First, the court must accept all factual allegations in the complaint as true and must also consider other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions, "in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. at 2509. Then, to determine whether the facts in the complaint and in these other sources give rise to a strong inference of scienter, the court must ask whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 2510. The court must be careful to consider whether "*all* of the facts

5

alleged, taken collectively, give rise to a strong inference of scienter, not whether *any individual* allegation, scrutinized in isolation, meets that standard." Id. at 2509 (emphasis in original).

The Supreme Court has defined the required state of mind in a Section 10(b) claim as "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, 127 S. Ct. at 2504-05. The Second Circuit has also concluded that "recklessness is a sufficiently culpable mental state in the securities fraud context." Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., No. 06-2902-CV, 2008 WL 2521676, at *3 (2d Cir. June 26, 2008). The Second Circuit has summarized its case law in this area

> as suggesting that the required strong inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor.

Id. (quoting Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000)).

### III. DISCUSSION

#### A. Menorah Group's Section 10(b) Claims

Menorah Group argues that it has alleged facts sufficient to meet its pleading burden under the PSLRA, and that it has raised a strong inference that Sorin had the required state of mind with respect to the Additional Accounting Manipulations. The court will consider the four possible ways that Menorah Group could establish scienter to see if it has satisfied its pleading burden.

##### 1. Did Sorin Benefit in a "Concrete and Personal" Way From the Fraud?

The court finds that Menorah Group has not sufficiently alleged that Sorin "benefitted in a concrete and personal way from the purported fraud." The goal of the Additional Accounting

6

Manipulations was to increase the price of Comverse's stock by making Comverse appear to be a corporation with consistent financial results. However, it is insufficient to raise a strong inference of scienter merely to allege that the defendant acted in order to increase the price of a corporation's stock, because such a motivation is "omnipresent" among corporate insiders. Novak, 216 F.3d at 307. Instead, what is normally required is for the plaintiff to allege that corporate insiders misrepresented "to the public material facts about the corporation's performance or prospects in order to keep the stock price artificially high while they sold their own shares at a profit." Id.

Menorah Group argues that Sorin's motivation is in this case made "concrete and personal" because the Additional Accounting Manipulations would increase the profit gained from Sorin's backdated options. However, the Additional Accounting Manipulations would have increased the profit gained from properly granted options as much as they did the profit gained from the backdated options. Moreover, Menorah Group has not alleged that Sorin engaged in insider trading keyed to the Additional Accounting Manipulations. Menorah Group has therefore failed to allege any concrete and personal benefit that Sorin realized from taking part in the Additional Accounting Manipulations.

2. Did Sorin Engage in Deliberately Illegal Behavior?

Menorah Group argues that several circumstances render compelling the inference that Sorin "engaged in deliberately illegal behavior." Sorin was an intimate of Alexander's and had an important role at Comverse, as General Counsel and as a Director and Corporate Secretary. He also spent many years at Comverse with Kreinberg. He has already admitted involvement in the options-backdating scheme, which occurred around the same time as the accounting

7

manipulations. Furthermore, Menorah Group argues that Sorin was knowledgeable about accounting matters, as evidenced by the following statement from Sorin's plea allocution:

> The company prepared and I approved proxy statements and SEC filings which falsely reported that Comverse options were issued with an exercise price and the fair market value of the stock on the grant date, when in fact Comverse was issuing backdated options with an exercise price lower than the fair market value on the date of grant and which therefore should have been accounted for as compensation to its employees.

(Declaration of Shaheen Rushd (Docket Entry # 190) Exh. C (Pleading of William F. Sorin).)

Menorah Group argues that, given Sorin's role at Comverse, his admitted involvement in other contemporaneous criminal activity at Comverse, and his knowledge about accounting matters, the inference that Sorin was actively involved in the accounting manipulations is strong within the meaning of Tellabs. Menorah Group argues further that because the accounting manipulations increased the profit received from the backdating scheme, the manipulations and the backdating were in reality part of one scheme and it is unlikely that Sorin was only involved in one part of the scheme, especially given the significant personal profit he received from the backdating scheme.

Menorah Group has not alleged facts adequate to support a strong inference that Sorin was involved in the Additional Accounting Manipulations. Although Sorin's plea allocution reveals that he knew that the backdating scheme understated Comverse's compensation expense, it does not follow that he was so knowledgeable about accounting that he would have been helpful to Kreinberg and Alexander in carrying out the more complex Additional Accounting Manipulations. Sorin's involvement in the options-backdating scheme involved the straightforward task of drawing up unanimous consent forms with "as of" dates that

8

memorialized the granting of the backdated stock options, a task appropriate for him as Comverse's General Counsel. With respect to the Additional Accounting Manipulations, however, Menorah Group has not alleged any facts to show why Sorin's participation would have been helpful to Alexander and Kreinberg, who were much more well-versed in accounting matters than he was.

Moreover, the court finds unconvincing Menorah Group's argument that the options-backdating scheme and the Additional Accounting Manipulations were so inter-related that Sorin's involvement in one makes it likely that he would be involved in the other, for each scheme could have existed independently. On the one hand, the options-backdating scheme would have created profits even if the Additional Accounting Manipulations had not inflated the price of Comverse stock, for it awarded recipients options that were valuable if the price of Comverse stock did not rise and even, in fact, if its price decreased. On the other hand, the Additional Accounting Manipulations would inflate the price of Comverse stock, and thereby benefit all of its stock and option-holders, even if no options were backdated. Another factor indicating the weak inter-relationship between the two schemes is that they involved separate aspects of Comverse's business operations — its compensation practices, on the one hand, and its reserve and expense accounting on the other.[2]

Menorah Group's allegations therefore do not give rise to a strong inference that Sorin

---

[2] Menorah Group's citation to In re Enron Corporation Securities, Derivative and ERISA Litigation, 235 F. Supp. 2d 549 (S.D. Tex. 2002) is inapposite. In that case, the court found particularized allegations as to one element of a scheme sufficient to satisfy the plaintiff's burden as to the other elements of the scheme. In Enron, however, plaintiffs had alleged "deliberate, repeated actions with shared characteristics that were part of an alleged common scheme." Id. at 694. Here, as discussed above, the options-backdating scheme and the Additional Accounting Manipulations lack shared characteristics that would justify adopting this approach.

9

engaged in deliberately illegal behavior. This conclusion is significantly bolstered by the Report of the Special Committee, which after a thorough investigation concluded that only Alexander and Kreinberg were involved in the Additional Accounting Manipulations. Absent any indication that the Special Committee was motivated to conceal Sorin's involvement in the Additional Accounting Manipulations, its Report renders even less compelling the inference that Sorin engaged in deliberately illegal behavior.

3. Did Sorin Know Facts or Have Access to Information Suggesting That His Public Statements Were Inaccurate or Fail to Check Information That He Had a Duty to Monitor?

Menorah Group has not alleged facts adequate to support the inference that Sorin knew facts or had access to information suggesting that Alexander and Kreinberg were engaging in the Additional Accounting Manipulations. Similarly, it has not alleged facts adequate to support the inference that, had Sorin monitored information that he had a duty to monitor, he would have uncovered the fraud.

Where "plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309. Similarly, where plaintiffs allege that the defendants "failed to review or check information that they had a duty to monitor," they must specifically identify "any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements." Teamsters Local 445 Freight Div. Pension Fund, 2008 WL 2521676, at *5.

As discussed above, see supra text at 4-5, the Additional Accounting Manipulations were carried out via a hidden column in an Excel spreadsheet maintained by Kreinberg. This hidden

10

column contained amounts representing excess reserves that could be taken back into income in order to smooth out earnings. The Additional Accounting Manipulations were also carried out via Kreinberg's direction to Comverse's Finance Department to reclassify expenses between different categories so as to show even growth rates across those different categories. Menorah Group has not alleged that Sorin had access to the Excel spreadsheet maintained by Kreinberg, or that he was privy to the communications between Kreinberg and Comverse's Finance Department in which Kreinberg directed the reclassification of expenses.[3] Likewise, it has not demonstrated any facts that would suggest that the Excel spreadsheet or those communications would have come to light in a reasonable investigation, or that it was clear on the face of Comverse's financial statements that they had been manipulated. Menorah Group has therefore not raised a strong inference that Sorin knew facts or had access to information revealing the Additional Accounting Manipulations, or that a reasonable investigation by Sorin would have uncovered them.

    4.      The Inference of Non-Scienter is More Compelling Than the Inference of Scienter

In sum, the court finds that Menorah Group's allegations fail to give rise to a strong inference that Sorin acted with scienter with respect to the Additional Accounting Manipulations. Menorah Group has failed to identify any action Sorin took in furtherance of the Additional Accounting Manipulations; it has failed to allege facts suggesting that Sorin's involvement

---

[3] The concealed nature of the Additional Accounting Manipulations therefore distinguishes the present case from those cases cited by Menorah Group in which defendants were found liable for failing "to check information they had a duty to monitor" or for ignoring a risk that was plain and apparent. See, e.g., Novak, 216 F.3d at 311; Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 704 (7th Cir. 2008).

would have been helpful to Alexander and Kreinberg in carrying out those Manipulations; and it has failed to allege facts suggesting that Sorin was reckless in failing to uncover the Manipulations.

The court finds that the more compelling inference from the facts alleged in the Revised Complaint, considered holistically, is that Alexander and Kreinberg acted on their own with respect to the Additional Accounting Manipulations, without Sorin's help or knowledge, and that Sorin was not reckless in failing to uncover the Additional Accounting Manipulations. Therefore, as Menorah Group has failed to allege facts raising a strong inference that Sorin acted with scienter, its claims under Section 10(b) must be dismissed.

## B. Menorah Group's Section 20(a) Claim

Section 20(a) may be used to impose joint and several liability upon a person who controls another person who violates Rule 10b-5(b) or certain other provisions of the securities laws. Section 20(a) calls the person who directly violates Rule 10b-5(b) the "controlled person" or "primary violator"; the "primary violator" is said to have committed a "primary violation." 15 U.S.C. § 78t(a).

To state a claim under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Communications v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007). Sorin does not dispute that Menorah Group has sufficiently alleged elements (1) and (2) with respect to its Additional Accounting Claims. He argues, however, that Menorah Group has failed to properly allege that he was a "culpable participant" in the Additional Accounting Manipulations.

12

Menorah Group argues that the Second Circuit's statement in ATSI that culpable participation must be shown by the plaintiff is dicta and that in reality it need only show elements (1) and (2) in order to survive a motion to dismiss. Menorah Group is correct that the description of the plaintiff's burden in ATSI constitutes dicta, for in ATSI the court found that the plaintiff had failed to properly allege a primary violation and therefore did not reach the question of whether the plaintiff also had to allege culpable participation. However, the court finds persuasive the analysis in Kalin v. Xanboo, Inc., 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007), that "the weight of Second Circuit precedent favors the view that a [p]laintiff plead 'culpable participation' to state a section 20(a) claim .... Thus, in order to withstand a motion to dismiss, a [S]ection 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." Therefore, because pleading a Section 20(a) claim requires a showing of scienter — a showing identical to that required for a Section 10(b) claim — it is subject to the heightened pleading requirement of the PSLRA. 15 U.S.C. § 78u-4(b)(2). Accordingly, Menorah Group's Section 20(a) claim against Sorin with regards to the Additional Accounting Manipulations fails for the same reason its Section 10(b) claim fails — it has not met the requirements of the PSLRA for alleging scienter.

## IV. CONCLUSION

For the reasons stated above, Menorah Group's Additional Accounting Claims against Sorin are DISMISSED.

SO ORDERED.

Dated: July 17, 2008
Brooklyn, N.Y.

NICHOLAS G. GARAUFIS
United States District Judge

13