**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

**IN RE COMVERSE TECHNOLOGY, INC.**
**SECURITIES LITIGATION**

---

**CV 06-1825 (NGG) (RER)**


**JURY TRIAL DEMANDED**


### CORRECTED THIRD CONSOLIDATED AMENDED COMPLAINT
### FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Stanley M. Grossman
Marc I. Gross
Shaheen Rushd
Murielle J. Steven Walsh
Jeremy A. Lieberman
Fei-Lu Qian
**POMERANTZ HAUDEK BLOCK**
**    GROSSMAN & GROSS LLP**
100 Park Avenue
New York, New York 10017
Telephone: 212-661-1100
Facsimile: 212-661-8665

Patrick V. Dahlstrom
**POMERANTZ HAUDEK BLOCK**
**    GROSSMAN & GROSS LLP**
One North LaSalle Street
Suite 2225
Chicago, Illinois 60602
Telephone: 312-377-1181
Facsimile:  312-377-1184

**Attorneys for Lead Plaintiff**
**The Menorah Group and**
**Plaintiff Steven Prystowsky**

**Dated:   March 10, 2009**

## TABLE OF CONTENTS

**NATURE OF THE ACTION** .......................................................................2

**JURISDICTION AND VENUE** ................................................................7

**THE PARTIES** .........................................................................................7

    Plaintiffs .................................................................................................7
    Defendants ..............................................................................................8
    The Officer Defendants..........................................................................8
    The Compensation/Audit Committee ("CAC") Defendants...........................9

**BACKGROUND** ....................................................................................10

    Comverse's Business ...........................................................................10
    Stock Options........................................................................................10
    Comverse's Option Plans....................................................................11
    The Approval Process for Comverse's Stock Option Grants ....................12
    Comverse's Accounting for Stock Options ...................................13

**THE FRAUDULENT SCHEME** ..........................................................15

    Defendants' Backdating of Options....................................................15
    The "Slush Fund"................................................................................18
    The Additional Accounting Claims ....................................................20

**THE FALSE AND MISLEADING NATURE OF STATEMENTS**
    **ISSUED BY DEFENDANTS DURING THE CLASS PERIOD** .............20

**THE FALSE STATEMENTS** ................................................................23

    Fiscal Year End January 31, 2001 ......................................................23
    The Two Proxy Statements Filed on May 11, 2001 .........................25
        The Fiscal 2000 Proxy Statement .................................................25
        The Fiscal 2001 Proxy Statement .................................................27
    1Q01.....................................................................................................28
    2Q01.....................................................................................................29
    3Q01.....................................................................................................30
    4Q01/YE January 31, 2002..................................................................30
    1Q02.....................................................................................................32
    2Q02.....................................................................................................33
    October 25, 2002 Proxy Statement .....................................................35
    3Q02.....................................................................................................36
    4Q02/YE January 31, 2003..................................................................37
    1Q03.....................................................................................................39

2Q03 ........................................................................................................39

3Q03 ........................................................................................................40

4Q03/YE January 31, 2004 ...................................................................41

1Q04 ........................................................................................................42

2Q04 ........................................................................................................43

3Q04 ........................................................................................................44

4Q04/YE January 31, 2005 ...................................................................44

1Q05 ........................................................................................................46

2Q05 ........................................................................................................47

3Q05 ........................................................................................................47

**THE TRUTH SLOWLY EMERGES** ................................................................48

March 14, 2006 .......................................................................................48

March 18, 2006 .......................................................................................50

April 17, 2006 .........................................................................................50

May 1, 2006 ............................................................................................51

May 4, 2006 ............................................................................................51

June 12, 2006 ..........................................................................................52

July - November, 2006 ............................................................................52

November 14, 2006 .................................................................................54

December 2006 - January 2007 ..............................................................55

March 23, 2007 .......................................................................................56

The Special Committee Report ...............................................................57

**CLASS ACTION ALLEGATIONS** ...............................................................64

**CLAIMS FOR RELIEF** ..................................................................................66

**Count I (Against All Defendants For Violations of Section 10(b)**
**And Rule 10b-5(b) Promulgated Thereunder)** ......................................66

Comverse .................................................................................................67

The Officer Defendants ...........................................................................68

The Compensation /Audit Committee ("CAC") Defendants .........................70

The Individual Defendants Collectively .................................................72

**Count II (Against Sorin For Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5(a) & (c))** ......................................74

**Count III (Against the Individual Defendants For**
**Violations of Section 20(a) of the Exchange Act)** ..................................75

**PRAYER FOR RELIEF** ..................................................................................80

**DEMAND FOR JURY TRIAL** .......................................................................81

Lead Plaintiffs The Menorah Group – Menorah Insurance Co. Ltd. and Mivtachim Pension Funds, Ltd-- individually and on behalf of all other persons similarly situated, by its undersigned attorneys, alleges upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon the investigation conducted by its attorneys which included, among other things, a review of the press releases issued by Comverse Technology Inc. ("Comverse" or the "Company"); the Company's public filings; securities analysts' reports about the Company; criminal indictments of certain defendants by the United States Department of Justice; statements made when entering guilty pleas; and the complaint filed against certain defendants by the Securities Exchange Commission ("SEC") for violations of the federal securities laws.

## NATURE OF THE ACTION

1.      This securities fraud class action is brought on behalf of purchasers of Comverse common stock between April 30, 2001 and November 14, 2006 (the "Class Period").  Named as individual defendants are former executives of the Company (the "Officer Defendants") and members of its Stock Option and Remuneration Committee (the "Compensation Committee") and its Audit Committee (the "Compensation/Audit Committee Defendants").

2.      During the Class Period, Comverse represented to investors that it was the pinnacle of probity and integrity, boasting that its financial statements "accurately reflect all corporate transactions and conformed to all legal and accounting requirements."  In fact, defendants engaged in one of the most brazen schemes to falsify financial statements and other corporate documents, with the intent and effect of misleading common stock purchasers, inflating the price of Comverse shares, and enriching defendants by millions of dollars.

2

3.      Central to the scheme was the backdating of stock option grants, the intentional falsification of related documents, and the improper accounting for the awards. As a result of their role in this scheme, the Officer Defendants were indicted by a federal grand jury, and were also charged by the SEC with civil fraud. Two of the indicted defendants have pled guilty.  The third fled the country, after offering a $5 million bribe to a co-conspirator to conceal his role in the wrongdoing.

4.      The impact of the scheme was enormous.  During the Class Period, Comverse understated its compensation expenses by approximately $192,000,000.  This represented 46% of the Company's reported pre-tax income for the entire Class Period.

5.      In connection with the scheme, Comverse issued to executives and employees options to purchase tens of millions of the Company's shares.  Under Generally Accepted Accounting Principles ("GAAP"), so long as the exercise price of the options was equal to or greater than the market price of Comverse shares at the time of grants, no option related expenses had to be charged against revenue.  Further, Comverse was able to receive favorable tax treatment for the issuance of such options.

6.      If, however, the market price of Comverse common stock was lower than the exercise price on the date that the options were granted, the difference between the exercise and market price had to be expensed for financial reporting purposes on a *pro rata* basis over the options' vesting period.  Additionally, the favorable tax treatment was lost.

7.      Throughout the Class Period, Comverse consistently represented in its SEC filings and reports to shareholders that the exercise prices for its stock options were at prevailing market prices at the time the grants were approved, and that the Company had accounted for them accordingly. These representations were absolutely false.   Defendants consistently

backdated the options. Rather than using market prices at the time of the actual grants, defendants cherry-picked earlier dates for the exercise prices, selecting dates when the prices of Comverse stock were substantially lower.  By so doing, defendants significantly increased the value of their stock options.

8.      During the Class Period, millions of shares covered by the backdated options (granted both prior to and during the Class Period) vested.  Defendants, however, failed to properly charge against revenues the expenses related to these backdated options (*i.e.*, the difference between the exercise price and the actual price of Comverse shares on the dates they were approved by the Compensation Committee).  Defendants also improperly deducted the option related expenses for federal tax purposes.

9.      The $192,000,000 of backdated option expenses that Comverse failed to record during the Class Period is just the tip of the iceberg, since the Company engaged in widespread accounting fraud in other areas as well.  In order to maintain higher stock prices to assure that the stock options would be more valuable as they vested, defendants further falsified Comverse's financial statements by numerous additional but "related" manipulations, including, but not limited to, misuse of reserves, misclassification of certain non-option related costs, manipulations of backlog, and improper revenue recognition, thereby further materially inflating reported profits.   Indeed, a Special Committee of the Board of Directors of Comverse investigating the back-dating and accounting irregularities during the Class Period (the "Special Committee") admitted that the Company's financial results "were intentionally misstated as a way of aligning the Company's performance with Wall Street expectations."

10.      This scheme cut right to the heart of the very corporate integrity that Comverse management proclaimed that it possessed, which is so critical to investors.  Arthur Levitt, a

former SEC Chairman, recently noted that stock option backdating "represents the ultimate in greed. . . . It is stealing, in effect.  It is ripping off shareholders in an unconscionable way."  The adverse impact of such pernicious misconduct on the integrity of the stock market prompted current SEC Chairman Christopher Cox to proclaim that, "The full weight of the federal government is being put behind this effort to stamp out fraudulent stock-option backdating."

11.     Class Members were unaware that anything was amiss until March 14, 2006, when Comverse first announced that it had formed its Special Committee to review prior stock option grants.  Over the next several months, the Company issued a series of statements, admitting that: (i) options had been improperly backdated; (ii) the Company had improperly accounted for the option grants; (iii) the Company had improperly accounted for contract related revenue and other expenses; (iv) the Company's financial statements for the Class Period could no longer be relied upon and would have to be restated; and (v) because of the ongoing accounting investigation, the Company could not file current period financial reports.

12.     As investors became aware of the widespread accounting fraud at the Company, and defendants' lack of integrity and credibility, the price of Comverse shares plummeted from $29.15 per share (on March 13, 2006, the day before the first disclosure) to less than $18 per share following the November 14, 2006 disclosure regarding additional but "related" accounting manipulations and irregularities.  This decline represents a loss of market capitalization exceeding $2 billion, indicative of the damages sustained by Class members.

13.     On January 29, 2008, the Company filed a Form 8-K with the SEC that presented a Report of the Special Committee (the "Report") which set forth certain facts, findings and conclusions regarding the options backdating scheme and accounting irregularities, including, but not limited to, the manipulation of earnings and revenue recognition.  The Report "confirmed

the existence of the option backdating and earnings manipulation" by the defendants; however, it did not purport to address all accounting irregularities and issues uncovered by the Special Committee's investigations or by the Company's auditors, *e.g.*, violations of Statement of Position ("SOP") 97-2, Software Revenue Recognition, specifically relating to vendor specific objective evidence ("VSOE").   Importantly, the Report also confirmed that during the Class Period, the defendants managed reported earnings and "routinely overrode existing internal controls and directed subordinates in the finance department of various Comverse subsidiaries to make unsupported quarter-end adjustments" in order "to 'smooth out' reported earnings." Indeed, the Report described Comverse as having "inadequate internal control over financial reporting, inadequate Board [of Directors] oversight and a corporate culture that discouraged questioning of senior management," which allowed Alexander, Kreinberg and Sorin to accomplish their options backdating scheme and manipulation of reported earnings.

14.     The Report left for a future report and/or filing with the SEC a detailed itemization of all of the accounting irregularities during the Class Period and the calculation of overstatement of earnings and revenues resulting thereby, as well as any impact the restatements at the Company's majority-owned subsidiaries Verint Systems, Inc. ("Verint") and Ulticom, Inc. ("Ulticom") will have on Comverse's restatement.

15.     The Menorah Group does not adopt any exculpatory or limiting language in the Report.

16.     This action seeks the recovery of damages caused by the options backdating and the additional but "related" accounting manipulations and irregularities, as well as the nullification of the options plans and the options granted thereunder.

## JURISDICTION AND VENUE

17.     The claims herein are asserted pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(a) and 78t(a)] and Rules 10b-5 promulgated thereunder by the SEC [17 C.F.R. §§ 240.10b-5].

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and § 27 of the Exchange Act [15 U.S.C. § 78aa].

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  One of Comverse's principal executive offices is in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

20.     In connection with the acts alleged in this Complaint, defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

21.     Lead Plaintiff Menorah Insurance Company, Ltd., ("Menorah") founded in 1935, is one of Israel's leading insurance companies.  Lead Plaintiff Mivtachim Pension Funds, Ltd. ("Mivtachim"), is the largest privately held pension fund in Israel.[1]  Both Menorah and Mivtachim purchased Comverse common stock during the Class Period, and still held those shares as of the end of the Class Period.  Both were damaged as a result of defendants' misconduct.

---

[1] In 2007, Menora Insurance Company, Ltd. and Mivtachim Pension Funds, Ltd. changed their names to Menora Mivtachim Insurance, Ltd. and Menora Mivtachim Pensions, Ltd respectively.

22.     Plaintiff Steven B. Prystowsky purchased 500 shares of Comverse common stock on May 18, 2001, which he still held as of the end of the Class Period, and was damaged as a result of defendants' misconduct.

**Defendants**

23.     Defendant Comverse Technology Inc. is a New York corporation which maintains its principal executive office at 909 Third Avenue, New York, NY 10022.   The aggregate number of shares of Comverse common stock outstanding as of December 1, 2005, was approximately 202 million.   During the Class Period, Comverse's common stock was actively traded on the NASDAQ National Market ("NASDAQ") under the ticker symbol "CMVT."   Since the Company's delisting, Comverse shares are traded on the Pink Sheets under the ticker symbol "CMVT.PK."

**The Officer Defendants**

24.     Defendant Jacob "Kobi" Alexander ("Alexander") served as Chairman of Comverse's Board of Directors from September 1986 until his resignation on May 1, 2006. Alexander also served as the Company's CEO from April 1987 until his resignation.   During the Class Period, Alexander sold 1,239,040 Comverse shares for $25,830,000 at prices inflated by the fraudulent scheme.

25.     Defendant David Kreinberg ("Kreinberg") served as the Company's Chief Financial Officer ("CFO") from May 1999 until his resignation on May 1, 2006.   From 2002 until May 1, 2006, Kreinberg served as the Company's Vice President of Finance.   During the Class Period, Kreinberg sold 342,143 Comverse shares for $7,782,198 at prices inflated by the fraudulent scheme.

26.     Defendant William F. Sorin ("Sorin") served as the Company's General Counsel and Senior General Counsel from October 1984 until his resignation on May 1, 2006.   During the

8

Class Period, Sorin also served as the Company's Corporate Secretary and as a Director.  From 1994 to 2001, during which Comverse stock options were consistently backdated, Sorin received more than $2.5 million in legal fees from Comverse.

### The Compensation/Audit Committee ("CAC") Defendants

27.    Defendant John H. Friedman ("Friedman") served as a Director of Comverse from June 1994 through April 2007.  Throughout the Class Period, Freidman served as Chairman of the Compensation Committee and a member of the Audit Committee.  During the Class Period, Friedman sold 59,000 Comverse shares for $1,292,400 at prices inflated by the fraudulent scheme.

28.    Defendant Ron Hiram ("Hiram") has served as a Director of Comverse from June 2001 through December 2006, and was also a Director between 1986 and 1987.  Throughout the Class Period, Hiram served as a member of the Compensation Committee and as the Chairman of the Audit Committee.  During the Class Period, Hiram sold 44,000 Comverse shares for $1,090,800 at prices inflated by the fraudulent scheme.

29.    Defendant Sam Oolie ("Oolie") served as a director of Comverse from May 1986 through April 2007.   Throughout the Class Period, Oolie served as a member of the Compensation Committee and a member of the Audit Committee.  During the Class Period, Oolie sold 81,000 Comverse shares for $1,820,000 at prices inflated by the fraudulent scheme.

30.    Defendants Friedman, Hiram and Oolie are hereinafter referred to as the "Compensation/Audit Committee Defendants" or the "CAC Defendants." All the Officer Defendants and CAC Defendants are hereinafter collectively referred to herein as the "Individual Defendants."

## BACKGROUND

### Comverse's Business

31.     Comverse designs, manufactures, markets, and supports computer and telecommunications systems and software for multimedia communications and information processing applications.  The Company's products are used in a variety of applications by fixed and wireless telephone network operators, government agencies, call centers and financial institutions.

### Stock Options

32.     Stock options enable employees to purchase company stock for a limited period of time at a specified price called the "exercise price."  When the employee exercises the option, he or she purchases the stock from the company at the exercise price, regardless of the stock's price at the time the option is exercised. The exercise price is determined by the closing price of the stock on the "grant date." When the grant date of a stock option is backdated, the exercise price is actually set lower than the price of the stock on the date the grant was actually made.  As a result, the grantee pays less for the stock, and the company (the counterparty to the option grant) receives less when the stock option is exercised.  Moreover, when shares rise above the rigged exercise price, the stock option holder profits by purchasing shares at the lower exercise price, and selling them at the higher market price.

33.     Manipulating the dates of stock option grants is antithetical to the express purpose of such compensation. Stock options are intended to align the interests of employees with that of the company by encouraging them to enhance shareholder value.  In contrast, backdating option grants to correspond to low trading dates creates an instantaneous paper profit for the option awardee, depriving the option program of its primary purpose of tying an employee's compensation to the company's performance.

### Comverse's Option Plans

34.     During the period relevant to this case, Comverse granted stock options to the Officer Defendants and other employees pursuant to four different stock option plans (the "Plans"). Defendant Sorin drafted the Plans, which were approved by the Compensation Committee, and then submitted to the Company's shareholders for approval by proxy vote.

35.     Stock options were granted on a company wide basis under the following Plans:

| PLAN | EFFECTIVE FROM – TO | SHARES AVAILABLE UNDER |
|------|---------------------|------------------------|
| **THE PLAN** | | |
| 1997 Stock Incentive Compensation Plan | 11/21/97-11/20/07 | 2,500,000 |
| 1999 Stock Incentive Compensation Plan | 05/13/99-05/12/09 | 3,500,000 |
| 2000 Stock Incentive Compensation Plan | 09/15/00-09/14/10 | 9,000,000 |
| 2001 Stock Incentive Compensation Plan | 06/15/01-06/15/11 | 9,700,000 |

36.     The Plans' relevant terms were identical.  Their stated purpose was to attract and retain employees of the Company by aligning the interests of the beneficiaries and that of the Company and its shareholders. Generally, these options vested over 4 years.  Defendants' backdating not only rigged the stock options' exercise price, but also shortened their vesting periods.

37.     There were two types of stock options under the Plans: (1) "incentive options" (as defined by Section 422 of the Internal Revenue Code), and (2) "non-qualified options," which had different tax consequences.  The incentive Plan expressly provided in part:

> **The exercise price of Incentive Stock Options must not be less than the price of a share of Common Stock on the NASDAQ National Market System ("Fair Market Value") on the grant date.**

38.     While the Plans allowed Comverse to grant "in the money" stock options for "nonqualified" grants, the Company represented that it never did so.

39.     Each Plan defined "fair market value" as the closing sale price of a share of Comverse common stock on the date of grant as published by the NASDAQ.

**The Approval Process for Comverse's Stock Option Grants**

40.     During the Class Period, the authority to determine Comverse's stock options resided with its Compensation Committee, whose Charter set forth its members' duties, including:

a.      Determining salaries and incentive compensation for the Company's executive officers;

b.      Administering the issuance of awards under the Company's stock option plans and such other compensation plans as may be assigned by the Board from time to time.

41.     Consistent with the Charter, each Plan gave sole authority to the Compensation Committee to: (1) select the employees that would receive awards under the Plans; (2) determine the type and amount of stock options to be awarded to such employees; and (3) set the exercise price of each stock option.

42.     From 1987 until March 2003, Comverse's By-Laws authorized the Compensation Committee to formally grant options in one of two ways.  The Compensation Committee could grant options by holding a meeting at which a quorum of the members were present, if a majority of those present at the meeting approved the award.  Alternatively, the Compensation Committee could grant options without a formal meeting if all members consented in writing to the adoption of a resolution authorizing the award (otherwise known as a "unanimous written consent" or "UWC").   In order for the written consents to be effective, all Compensation Committee members' signatures were required.

43.     During the relevant period, all of the Plans were purportedly approved by the Compensation Committee by unanimous written consents.

**Comverse's Accounting for Stock Options**

44.     During the relevant period, Comverse accounted for its stock options for financial reporting purposes (as opposed to tax-reporting purposes) under the guidelines established by Accounting Principles Board (APB) Opinion 25, *Accounting for Stock Issued to Employees*, Oct. 1972.  Under APB 25, options that were granted at or above the market price on the date of the grant ("at-the money" or "out-of-the money") had no impact at all on any of the financial statements.  If options were granted "in-the-money" (as was the case with Comverse), the difference between the grant date stock price and the exercise price (called the "intrinsic value" of the option) had to be recorded as an expense and deducted from income. (For purposes of this complaint, the intrinsic value is referred to as the "excess profits").

45.     Under APB 25, any excess profits (aggregated over all option grants) had to be amortized as "compensation expenses" evenly over the vesting period. These amortized compensation expenses had to be included in the "sales, general and administration expenses" line item on the company's Profit and Loss Statement. When done properly, this treatment lowered the reported income while creating two offsetting entries in the balance sheet: a deferred tax asset equal to the lowered tax due to the compensation expense and an offsetting increase in the shareholder equity.

46.     During the relevant period, authoritative guidance for the accounting for stock options was also provided by Statement of Financial Accounting Standards No. 123, *Accounting for Stock-Based Compensation*, ("SFAS 123") (effective for fiscal years beginning after December 15, 1995).  SFAS 123 governed all issues other than the valuation methodology.  In particular, SFAS 123 determined the "approval" date for stock options, which then determined whether the exercise price was at or below the market price for the underlying shares.  SFAS 123 required that the grant date for financial reporting purposes be no earlier than the date when

13

those persons empowered to make the grants had taken all required actions. (*See,* the definition of "Grant Date" in Appendix E of SFAS 123). This principle was reiterated in FASB Interpretation No. 44, *Accounting for Certain Transactions Involving Stock Compensation*, ("FIN 44"), paragraphs 86 and 87, which became effective July 1, 2000. As indicated above, in the case of Comverse, such approval was effective only when the Compensation Committee actually voted to approve the grants.

47.    In its Form 10-K's filed with the SEC throughout the Class Period, Comverse consistently represented that its stock options had been accounted for in a manner consistent with GAAP:

> The Company applies Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations in accounting for its option plans. Accordingly, as all options have been granted at exercise prices equal to fair market value on the date of grant, no compensation expense has been recognized by the Company in connection with its stock-based compensation plans.
>
> \*\*\*
>
> Options which are designated as "incentive stock options" under the option plans may be granted with an exercise price not less than the fair market value of the underlying shares at the date of grant …

48.    As detailed below, this was false. For those options granted through 2001 (and which therefore vested through 2005), the exercise prices were, in fact, "less than the fair market value of the underlying shares at the date of grant." As such, compensation expenses should have been "recognized by the Company in connection with its stock-based compensation plans," but were not.

49.    The relationship of the exercise price to the market price of Comverse shares on the approval date not only impacted the Company's financial results, but also impacted its taxable income. During the Class Period, taxation of stock options was governed by Section

162(m) of the IRS Code, 26 U.S.C. § 162(m) ("Section 162(m)"), which provides that compensation for stock options to executives who earned in excess of $1 million per year is deductible, so long as those grants were made at or above the market value of the stock, and "solely on account of the attainment of one or more performance goals." If the exercise price was below the market price, the company could not deduct the value of stock options. The deduction did not take place until the options were exercised, and was measured by the amount by which the market price at that time exceeded the exercise price.

**THE FRAUDULENT SCHEME**

**Defendants' Backdating of Options**

50.     Starting prior to 1998, and continuing through October 2001, defendants awarded stock options with exercise prices below the market price of Comverse shares on the grant dates, and improperly accounted for such awards. Alexander and/or Kreinberg cherry-picked dates when Comverse shares closed at prices well below the then current price of the stock.  Sorin (or Fran Rail, an assistant of Alexander, acting at the behest of Sorin), then drafted unanimous written consent forms for execution by the Compensation Committee Defendants.

51.     Defendants knew that it was improper to grant options for dates earlier than the actual approval date. They also knew that any difference between the exercise price and the price of Comverse shares on the approval date would have to be expensed, thereby reducing profits. In an effort to cover up this improper practice, and avoid its adverse accounting impact, the consent forms provided to the Compensation Committee Defendants neither provided for, nor reflected, the dates when the consent forms were actually signed, *i.e.,* the date the approval was granted. Rather, the consent forms contained "as of" dates, *i.e.,* the favorable dates cherry-picked by Alexander or Kreinberg which were weeks or months earlier.

15

52.     Thus, on their face, the consent forms were deceptive. The Compensation Committee Defendants backdated the options by signing the consent forms containing the "as of" dates, which they knew were at prices which bore no relationship to the price of Comverse shares on the execution date.  They also knew that such execution was in direct contravention of the representation made in Comverse's Form 10-K's and elsewhere that "all options have been granted at exercise prices equal to fair market value on the date of grant."

53.     The grant of 9,446,407 stock options in 2001 was emblematic of the fraud. The Compensation Committee Defendants did not actually approve the grants until December 18, 2001, when they signed the consent forms. Comverse shares closed on that date at $20.77. Nonetheless, defendants represented that the grants had been approved on October 22, 2001, when Comverse closed at $16.05 per share, the stock's second lowest price for the fiscal year.



54. This was not mere coincidence. The date had been cherry-picked by Kreinberg in late November, by which time the stock had risen more than 10% above this "exercise price."

55. As a result, these stock options, when granted, were "in the money" by at least $4.72 per stock option, representing a windfall of nearly $45 million, which should have been booked as a compensation expense.

56. This systematic backdating started at least as early as 1994, and continued through 2001. The following charts detail the Company's backdating of stock options to all employees, and each of the Officer Defendants with respect to annual grants that vested during the Class Period, which should have resulted in expensing of the excess profits as compensation costs.

| Purported Date of Grant | Number of Stock Options | Exercise Price | Actual Grant Date | Market Price on Actual Grant Date | Difference in Price | Excess Profits |
|---|---|---|---|---|---|---|
| 1/28/98 | 3,109,473 | $ 31.25 | 2/19/1998 | $ 45.31 | $ 14.06 | $ 43,719,190 |
| 10/9/98 | 744,000 | $ 30.00 | 10/15/1998 | $ 36.50 | $ 6.50 | $ 4,836,000 |
| 10/18/99 | 3,834,333 | $ 93.00 | 11/23/1999 | $ 127.06 | $34.06 | $ 130,597,382 |
| 10/22/01 | 9,446,407 | $ 16.05 | 12/18/2001 | $ 20.77 | $ 4.72 | $ 44,587,041 |
| Total | 17,134,213 | | | | | $223,739,613 |

| Defendant | Purported Date of Grant | Number of Stock Options | Exercise Price | Actual Grant Date | Market Price on Actual Grant Date | Difference in Price | Excess Profits |
|---|---|---|---|---|---|---|---|
| Alexander | 1/27/1998 | 500,000 | $ 31.25 | 2/19/1998 | $ 45.31 | $ 14.06 | $ 7,030,000 |
| Alexander | 10/9/1998 | 250,000 | $ 30.00 | 10/15/1998 | $ 36.50 | $ 6.50 | $ 1,625,000 |
| Alexander | 10/18/1999 | 315,000 | $ 93.00 | 11/23/1999 | $ 127.06 | $ 34.06 | $ 10,728,900 |
| Alexander | 10/22/2001 | 600,000 | $16.05 | 12/18/2001 | $ 20.77 | $ 4.72 | $ 2,832,000 |
| Total | | 1,665,000 | | | | | $22,215,900 |

| Defendant | Purported Date of Grant | Number of Stock Options | Exercise Price | Actual Grant Date | Market Price on Actual Grant Date | Difference in Price | Excess Profits |
|---|---|---|---|---|---|---|---|
| Kreinberg | 1/27/1998 | 35,000 | $ 31.25 | 2/20/1998 | $ 45.31 | $ 14.06 | $ 492,100 |
| Kreinberg | 10/9/1998 | 10,000 | $ 30.00 | 10/15/1998 | $ 36.50 | $ 6.50 | $ 65,000 |
| Kreinberg | 10/18/1999 | 37,500 | $ 93.00 | 11/23/1999 | $ 27.06 | $ 34.06 | $1,277,250 |
| Kreinberg | 10/22/2001 | 125,000 | $ 16.05 | 12/18/2001 | $ 20.77 | $ 4.72 | $ 590,000 |
| | | 207,500 | | | | | $2,424,350 |

| Defendant | Purported Date of Grant | Number of Stock Options | Exercise Price | Actual Grant Date | Market Price on Actual Grant Date | Difference in Price | Excess Profits |
|---|---|---|---|---|---|---|---|
| Sorin | 1/27/1998 | 50,000 | $31.25 | 2/21/1998 | $ 45.31 | $14.06 | $ 703,000 |
| Sorin | 10/9/1998 | 7,500 | $30.00 | 10/15/1998 | $ 36.50 | $ 6.50 | $ 48,750 |
| Sorin | 10/18/1999 | 30,000 | $93.00 | 11/23/1999 | $127.06 | $34.06 | $1,021,800 |
| Sorin | 10/22/2001 | 27,000 | $16.05 | 12/18/2001 | $ 20.77 | $ 4.72 | $ 127,440 |
| | | 114,500 | | | | | $1,900,990 |

### The "Slush Fund"

57.     Consistent with their sole authority to approve stock option grants, Compensation Committee Defendants were provided with a list setting out each designated recipient, the number of stock options allocated to that recipient, and the total number of options for approval. Starting in September 1999, Alexander and Kreinberg sought to create a pool of 250,000 stock options that they could dole out to individuals *after* the Compensation Committee had approved grants for the year. They did so in 1999 by simply including fictitious names and addresses (all of which were the home address for Alexander's assistant, Fran Rail) in the list provided to the Compensation Committee Defendants. In 2000, the list prepared at the instruction of Alexander

and Kreinberg omitted the fictitious names, but included 250,000 more stock options in the final tally.

58.     The Compensation Committee Defendants approved these awards, indicative of their willingness to readily participate in the scheme, by rubber stamping the proposals provided by the Officer Defendants. The stock options, as approved, were then entered by Fran Rail onto Comverse's so-called "Equity Edge," a computer database.  Ms. Rail, capturing the essence of the fraud, labeled the account containing the fictitious names "I.M. Phantom," which was later changed to "Fargo."

59.     From 1999-2002, Alexander lavished approximately 175,000 stock options on employees of the Company from the Phantom/Fargo account.  For example, in or about August 2000 and December 2000, Alexander instructed Ms. Rail to assign approximately 89,000 stock options from the account to an executive who had previously been given stock options in a Comverse subsidiary (CTI) which had become worthless. To make up this loss, Alexander gave the executive slush fund stock options that were "in the money" by at least $4 million at the time they were allocated.  Alexander further directed Ms. Rail to make these options immediately exercisable.  To avoid attention, Kreinberg e-mailed the CTI executive with instructions to "please try and have [your broker] sell the shares slowly and not hit the stock price."  This excess profit of $4,000,000 was improperly excluded from Comverse's sales, general and administrative ("SG&A") expenses for fiscal year end January 31, 2001.

60.     In the Report, the Company admitted to "the practice of deliberate backdating," and that "between 1991 and 2001, almost 54 million stock options (issued via 29 grants to 5,386 grantees) were backdated to obtain advantageous exercise prices, with the knowledge and participation" of Alexander, Sorin, and Kreinberg.  The Company also admitted that "[e]xcept

19

for one in-person meeting in September 1993, the Compensation Committee approved all option grants from 1991 to 2001 by UWCs."

61.     In the Report, the Company also admitted that "members of the Compensation Committee stated that in executing the UWCs, they did not focus on the 'as of' grant dates," and "they did not make any effort to determine whether the 'as of' grant dates corresponded with the dates of the calls from Sorin or with action taken by management on the 'as of' grant dates."  In fact, "most, if not all, of the exercise prices for options granted by UWC from 1991 through 2001 were below the fair market value of the stock on the day that Alexander had selected as the nominal 'as of' grant date and corresponding exercise price, and probably below the fair market value of the stock on the day or days on which UWCs were subsequently executed by Compensation Committee members."

**The Additional Accounting Claims**

62.     Moreover, in order to enable defendants to sell their Comverse shares which they acquired through the backdated options at a profit, Comverse improperly accounted for a wide range of other matters, including:  misuse of reserves, manipulations of backlog, premature recognition of revenue; improper classification of certain expenses; and improper treatment of tax deferral accounts.  The Company has admitted to its improper accounting with regard to these matters, and as a result thereof, will be restating reported results for the period 2001-2006. The Report is the most recent admission of the Company's accounting irregularities during the Class Period.

**THE FALSE AND MISLEADING NATURE OF STATEMENTS ISSUED BY DEFENDANTS DURING THE CLASS PERIOD**

63.     The purpose of the foregoing fraudulent scheme was to inflate Comverse's reported results while illegally enriching the Officer Defendants and a vast number of Company

employees.  As part of that scheme, throughout the Class Period, defendants issued statements set forth at ¶¶ 70-157, *infra*, that were materially false and misleading.  Among other things, Comverse's compensation expenses were understated by approximately $192 million as follows:

| Year | 1/31/01 | 1/31/02 | 1/31/03 | 1/31/04 | 1/31/05 | 1Q-3Q 2005 |
|---|---|---|---|---|---|---|
| Reported Pre-Tax Income (including all charges) | $267,963,000 | $58,343,000 | ($123,839,000) | $8,580,000 | $83,156,000 | $129,276,000 |
| Reported Net Income | $249,136,000 | $54,619,000 | $(129,478,000) | $(5,386,000) | $57,330,000 | $97,370,000 |
| Apportioned Excess Profits of Backdated Options | $(44,788,140) | $(47,574,830) | $(44,702,854) | $(35,633,768) | $(11,146,760) | $(2,600,000) |

64.     Except for 1Q-3Q 2005, the "apportioned excess profits" were computed by expensing the "excess profits" of the backdated options on a pro rata basis over their four year vesting periods based on charges set forth in the SEC Complaint against the Individual Defendants dated August 8, 2006.  The foregoing reflects the minimum by which Comverse understated expenses and overstated profits for each year during the Class Period. It does not account for the (1) improperly recognized revenues; (2) manipulation of reserves; (3) misclassification of certain expenses; (4) misstatement of backlog; (5) improper accounting for tax deferral assets; and (6) the financial statement tax expense impact of the improper accounting for these expenses.  Nor does the foregoing reflect Comverse's improper deduction from its tax returns of compensation expenses related to backdated options.

65.     The statements issued by Comverse during the Class Period, set out at ¶¶ 70-157, *infra*, were also materially false and misleading because, as Comverse has now admitted, it is required under GAAP to restate its previously reported financial results due to accounting irregularities, including, but not limited to, the manipulations of earnings, revenues and reserves, as well as misclassification of expenses and misreporting of backlog, in amounts that will be disclosed after completion of its internal investigation.  The fact that the Company has conceded

the need to restate its financials due to improper accounting for such items is an admission that the financial statements were false when issued (*See*, APB 20) and that the misstatements were "material." (*See*, APB 38). It is also an admission that the facts with respect to these items "existed at the time the financial statements were prepared" (*See*, APB 20). These items will hereinafter be referred to as the "additional but 'related' accounting manipulations and irregularities."

66.     With respect to Comverse's statements regarding its stock options, defendants:

a.     misrepresented that the stock option grants had been approved at the "market prices;"

b.     failed to disclose that the stock option grants had not been accounted for in accordance with GAAP;

c.     materially understated the amount of compensation received by the Officer Defendants by failing to disclose that they had been awarded options that were "in the money" at the time granted;

d.     failed to disclose that senior management's salaries and option grants (including those of the Officer Defendants) had not been determined as a result of arms-length negotiation with Comverse's Compensation Committee, but were rather the result of collusion with the Committee;

e.     failed to disclose that the stated purpose of option grants (alignment of their compensatory interests with that of the Company and shareholders), was nullified by the backdating of options, which rigged the compensation to provide windfalls to the Officer Defendants and others; and

f.     failed to disclose that proposed grants (for which shareholder approval was sought) included grants to fictitious employees.

67.     In addition, defendants Alexander and Kreinberg falsely certified under §§ 302 and 906 of the Sarbanes Oxley Act ("SOX") to the accuracy of the Company's financial reporting and adequacy of its internal controls.  These certifications were themselves false and misleading, both because Alexander and Kreinberg knew the results were not accurate and because the Company's internal financial controls were grossly inadequate.

68.     Furthermore, as a result of the backdating, "the Company granted Incentive Stock Options ("ISOs") at a discount to fair market value, which violated the Plans and rendered them Non-Qualified Stock Options ("NQs") because ISOs granted at a discount to fair market value on the date of grant do not meet the requirements of ISOs as defined in Section 422 of the Internal Revenue Code of 1986 (as amended) . . . . The Company also granted NQs at discounts to fair market value in violation of certain Plans."

69.     By virtue of the foregoing, the defendants misled Class Members and the market regarding the reliability of the Company's financial statements, as well as the integrity of the Officer Defendants.

## THE FALSE STATEMENTS

70.     Throughout the Class Period, defendants issued statements in press releases and SEC filings that were false and misleading for the reasons set forth in ¶¶ 50-69, *supra*.

### Fiscal Year End January 31, 2001

71.     On April 30, 2001, Comverse filed with the SEC its Form 10-K405 for the fiscal year ended January 31, 2001 (the "2001 Form 10-K405). For the fiscal year, the Company reported sales of $1,225,058,000; SG&A expenses of $259,607,000; pre-tax income of $267,963,000; net income of $249,136,000; and earnings per share of $1.54.

72.     The 2001 Form 10-K405 was signed by each of the Individual Defendants.

73.     The foregoing statements were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $44,700,000, and income was overstated, as a result of defendants' improper accounting for backdated options. The Company's reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and

irregularities set forth in ¶¶ 62, 191, 193-206. These material misstatements misled Class Members regarding the reliability of the Company's financial statements and integrity of the Individual Defendants.

74.    With respect to stock options, the 2001 Form 10-K405 stated the following:

> The Company applies Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations in accounting for its option plans. Accordingly, as *all options have been granted at exercise prices equal to fair market value on the date of grant,* no compensation expense has been recognized by the Company in connection with its stock-based compensation plans.
>
> ***
>
> Employee Stock Options – At January 31, 2001, 26,163,560 shares of common stock were reserved for issuance upon the exercise of options then outstanding and 507,856 shares were available for future grants under Comverse's Stock Option Plans, under which options may be granted to key employees, directors, and other persons rendering services to the Company. *Options which are designated as "incentive stock options" under the option plans may be granted with an exercise price not less than the fair market value of the underlying shares at the date of grant….*

(Emphasis Supplied).

75.    The foregoing statements regarding Comverse's stock options were materially false and misleading because they misrepresented and/or failed to disclose that, in fact: (i) the prior stock grants had been awarded with exercise prices *less* than the fair market value of the underlying shares at the date of grant; and (ii) significant compensation expenses should have been recognized, but had not been.

**The Two Proxy Statements Filed on May 11, 2001**

76.     On May 11, 2001, Comverse filed two Proxy Statements, one relating to fiscal year ended January 31, 2000 (the "Fiscal 2000 Proxy Statement'), and the second relating to fiscal year ended January 31, 2001 (the "Fiscal 2001 Proxy Statement").

**The Fiscal 2000 Proxy Statement**

77.     The Fiscal 2000 Proxy Statement dated August 3, 2000, was issued in connection with a shareholders' meeting that had already taken place on September 15, 2000 (and thus the filing was late).  The Fiscal 2000 Proxy Statement was submitted to shareholders "By Order of the Board of Directors" and signed by defendant Sorin as Secretary to Comverse.

78.     Among other things, the Fiscal 2000 Proxy Statement stated that the "exercise price of Incentive Stock Options must not be less than the price of a share of Common Stock on the NASDAQ National Market System ("Fair Market Value") on the grant date," and that the proposed grants conformed to this requirement.

79.     With respect to the 2000 Stock Incentive Compensation Plan, the Fiscal 2000 Proxy Statement represented that:

> The Board of Directors has approved the 2000 Stock Incentive Compensation Plan (the "Incentive Plan") and has recommended that the Incentive Plan be submitted to the shareholders for adoption at the Annual Meeting.
>
> ***
>
> Incentive Plans are to attract, retain and motivate directors and key employees, to align their respective interests with shareholders' interests through equity-based compensation and to permit the granting of awards that will constitute performance-based compensation for certain executive officers under Section 162(m) of the Code.
>
> ***
>
> The Plan shall be administered by the [Compensation] Committee, which shall have full power to interpret and administer the Plan and full authority to act in selecting the Employees to whom Awards will be granted, in determining the type and amount of

25

> Awards to be granted to each such Employee, the terms and conditions of Awards granted under the Plan and the terms of agreements which will be entered into with Holders.
>
> ***
>
> Subject to Section 3.2, the price per share at which Common Stock may be purchased upon exercise of an Option shall be determined by the [Compensation] Committee, *but, in the case of grants of Incentive Stock Options, shall be not less than the Fair Market Value of a share of Common Stock on the date of grant.*

(Emphasis supplied)

80.     As part of the Compensation Committee's Report concerning executive compensation, it was represented that:

> The Board of Directors believes that equity-based incentive arrangements, such as employee stock options and employee stock purchase plans, are among the most effective means available to the Company of aligning the interests of employees with the objectives of shareholders generally….

81.     The foregoing statements set forth in the Fiscal 2000 Proxy Statement were materially false and misleading because they misrepresented and/or omitted to disclose that, in fact: (i) prior stock grants had been awarded with exercise prices *less* than the fair market value of the underlying shares at the date of grant; (ii) significant compensation expenses should therefore have been recognized, but had not been; (iii) Alexander's and Kreinberg's stock sales during the prior year had included shares that had been acquired through the exercise of backdated options, thus constituting undisclosed additional compensation; (iv) the stock option grants had not been independently determined by the Compensation Committee, but rather were the result of collusion with the Officer Defendants; (v) the purpose of the stock option grants was not to align grantees' interests with those of the Company and its shareholders, but rather to provide them excessive windfalls; and (vi) prior stock options had been allocated to fictitious

employees from a slush fund. As a result, Class Members were misled regarding the reliability of the Company's financial statements and integrity of the Individual Defendants.

### The Fiscal 2001 Proxy Statement

82.    On May 11, 2001, Comverse filed with the SEC a second Proxy Statement on Schedule 14A in connection with an upcoming June 15, 2001 shareholders' meeting. The Fiscal 2001 Proxy Statement was submitted to shareholders "By Order of the Board of Directors" and signed by defendant Sorin as Secretary to Comverse.

83.    In connection with the request for shareholder approval of the 2001 Stock Incentive Compensation Plan, the Fiscal 2001 Proxy Statement represented the following concerning Comverse's stock option plan:

> The exercise price of the options is equal to the fair market value of the underlying shares at the date of grant.
>
>        ***
>
> The Board of Directors has approved the 2001 Stock Incentive Compensation Plan (the "Incentive Plan") and has recommended to the shareholders for adoption at the Annual Meeting. The purposes of the Incentive Plan are to attract, retain and motivate directors and key employees, to align their respective interests with shareholders' interests through equity-based compensation and to permit the granting of awards that will constitute performance-based compensation for certain executive officers under Section 162(m) of the Code.
>
>        ***
>
> The [Compensation] Committee has the authority to determine the Award (as defined below) recipients, the timing of Awards and the type, size and terms of each Award. It also has the authority to construe interpret and implement the Incentive Plan, including prescribing rules thereunder.
>
>        ***
>
> The exercise price of [Incentive Stock Options] must not be less than the price of a share of Common Stock on the NASDAQ National Market System ("Fair Market Value") on the grant date.

84.     As part of the Compensation Committee's Report concerning executive compensation, the Committee represented the following:

> The Board of Directors believes that equity-based incentive arrangements, such as employee stock options and employee stock purchase plans, are among the most effective means available to the Company of aligning the interests of employees with the objectives of shareholders generally, ...

85.     The foregoing statements in the Fiscal 2001 Proxy Statement were materially false and misleading because they misrepresented and/or failed to disclose that, in fact: (i) prior stock grants had been awarded with exercise prices *less* than the fair market value of the underlying shares at the date of grant; (ii) significant compensation expenses should therefore have been recognized, but had not been; (iii) Alexander's and Kreinberg's stock sales during the prior year had included shares that had been acquired through the exercise of backdated options, thus constituting undisclosed additional compensation; (iv) the stock option grants had not been independently determined by the Compensation Committee but rather were the result of collusion with the Officer Defendants; (v) the purpose of the stock option grants was not to align grantees' interests with those of the Company and its shareholders, but rather to provide them excessive windfalls; and (vi) prior stock options had been allocated to fictitious employees from a slush fund. As a result, Class Members were misled regarding the reliability of the Company's financial statements and the integrity of the Individual Defendants.

**1Q01**

86.     On June 4, 2001, Comverse announced results for the quarter ended April 30, 2001, reporting: (1) "record sales" of $365,037,000; and (2) "record" net income of $78,956,000 ($0.43 per diluted share).

87.     These results were repeated in the Company's Form 10-Q filed with the SEC on June 13, 2001.  Among other things, the Form 10-Q added that 1Q01 SG&A expenses were $78,189,000.  The 1Q01 Form 10-Q was signed by defendants Alexander and Kreinberg.

88.     The foregoing statements regarding 1Q01 results were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $11,200,000 and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements further misled Class Members regarding the reliability of the Company's financial statements and the integrity of the Individual Defendants.

**2Q01**

89.     On August 28, 2001, Comverse announced results for the quarter ended July 31, 2001.  Comverse posted sales of $345,090,000, compared to 2Q00 sales of $292,070,000.  Net income, excluding non-recurring charges, was $50,012,000 ($0.28 per diluted share), compared to $62,489,000 ($0.36 per diluted share) for 2Q00.  Including such charges, net income was $27,984,000 ($0.15 per diluted share).

90.     These results were repeated in the Company's Form 10-Q filed with the SEC on September 14, 2001. Among other things, the Form 10-Q added that 2Q01 SG&A expenses were $80,985,000.  The Form 10-Q was signed by defendants Alexander and Kreinberg.

91.     The foregoing statements regarding 2Q01 results were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $11,200,000, and its income was overstated as a result of defendants' improper accounting for

the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements further misled Class Members regarding the reliability and integrity of the Individual Defendants.

**3Q01**

92.     On December 11, 2001, Comverse announced results for its quarter ended October 31, 2001. The Company reported sales of $295,032,000.  Net income excluding non-recurring charges was $20,122,000 ($0.11 per diluted share).

93.     These results were repeated in the Company's Form 10-Q filed with the SEC on December 14, 2001.  Among other things, the Form 10-Q added that 3Q01 SG&A expenses were $83,312,000. The Form 10-Q was signed by defendants Alexander and Kreinberg.

94.     The foregoing statements regarding 3Q01 results were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $11,700,000, and its income was overstated as a result of defendants' improper accounting for and tax treatment of the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements further misled Class Members regarding the reliability of the Company's financial statements and the integrity of the Individual Defendants.

**4Q01/YE January 31, 2002**

95.     On March 12, 2002, Comverse announced its results for the fourth quarter and fiscal year ended January 31, 2002. The Company's reported fourth quarter sales were $265,059,000, compared to $346,553,000 in 4Q00.   Quarterly net income, excluding non-

recurring charges, was $10,627,000 ($0.06 per diluted share), compared with 4Q00 net income of $76,865,000 ($0.41 per diluted share).

96.     The Company also reported that fiscal year 2001 sales were $1,270,218,000, compared with $1,225,058,000 for fiscal 2000 and SG&A expenses were $323,036,000.  Annual pre-tax income was $58,343,000; net income, including non-recurring charges, was $54,619,000 ($0.29 per diluted share).

97.     Comverse's financial results for its fiscal year ended January 31, 2002, were repeated in the Company's Form 10-K filed with the SEC on April 30, 2002, which was signed by the Individual Defendants.

98.     The foregoing statements regarding 4Q and YE01 results were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $13,900,000 (for 4Q01) and $47,600,000 (for YE01), and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

99.     The 2001 Form 10-K also stated the following with regard to Comverse's stock options:

> Employee Stock Options – At January 31, 2002, 33,089,823 shares of common stock were reserved for issuance upon the exercise of options then outstanding and 1,834,615 shares were available for future grant under Comverse's Stock Option Plans, under which options may be granted to key employees, directors, and other persons rendering services to the Company. Options which are designated as "incentive stock options" under the option plans may be granted with an exercise price not less than the fair market value

> of the underlying shares at the date of grant…
>
> ***
>
> The Company applies Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations in accounting for its option plans. Accordingly, as all options have been granted at exercise prices equal to fair market value on the date of grant, no compensation expense has been recognized by the Company in connection with its stock-based compensation plans.

100.   The foregoing statements in the 2001 Form 10-K regarding Comverse's stock options were materially false and misleading when made because they misrepresented and/or failed to disclose that, in fact: (i) the prior stock grants had been awarded with exercise prices *less* than the fair market value of the underlying shares at the date of grant; and (ii) significant compensation expenses should have been recognized, but had not been.

### 1Q02

101.   On June 5, 2002, Comverse announced results for the quarter ended April 30, 2002.  The Company posted sales of $211,194,000 and a net loss, excluding non-recurring charges, of $8,183,000 ($0.04 per diluted share), compared with 1Q01 net income of $78,956,000 ($0.43 per diluted share).

102.   These results were repeated in the Company's Form 10-Q filed with the SEC on June 12, 2002, which added that SG&A expenses were $73,513,000. Defendants Alexander and Kreinberg signed the 1Q02 Form 10-Q.

103.   The foregoing statements regarding 1Q02 results were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $11,200,000, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting

manipulations and irregularities. These material misstatements further misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

**2Q02**

104.    On September 10, 2002, Comverse announced results for the quarter ended July 31, 2002. The Company reported sales of $181,210,000 and "a net loss, excluding non-recurring gains and charges, of $12,652,000 ($0.07 per diluted share), compared with 2Q01 net income of $50,012,000 ($0.28 per diluted share).

105.    These results were repeated in the Company's Form 10-Q filed with the SEC on September 13, 2002, which added that SG&A expenses were $72,498,000.

106.    Defendants Alexander and Kreinberg signed the 2Q02 Form 10-Q and certifications pursuant to §§ 302 and 906 of the Sarbanes-Oxley Act of 2002 (the "SOX Certifications"), falsely certifying that:

> 1. I have reviewed this quarterly report on Form 10-Q of Comverse Technology, Inc.;
>
> 2. Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

a)   designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b)   evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c)   presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)   all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls;

6.   The registrant's other certifying officers and I have indicated in his quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

The certifications signed pursuant to § 906 of Sarbanes-Oxley stated, in relevant part:

(1)   the accompanying Quarterly Report on Form 10-Q of the Company for the quarterly period ended October 31, 2002 (the "Report"), filed with the U.S. Securities and Exchange Commission, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

(2)   the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations

of the Company.

107. The foregoing statements regarding 2Q02 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $11,200,000, and its income was overstated as a result of defendants' improper accounting for and tax treatment of the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

**October 25, 2002 Proxy Statement**

108. On October 25, 2002, the Company filed a proxy statement under Form 14A, seeking approval of fiscal 2003 stock option grants at a shareholders' meeting scheduled for December 3, 2002. The October 25, 2002 Proxy Statement contained the following false and misleading statements about the operation and administration of the Stock Option Plan:

> The exercise price of the options is equal to the fair market value of the underlying shares at the date of grant.

109. As part of the Compensation Committee's Report concerning executive compensation, the Committee represented the following:

> The Board of Directors believes that equity-based incentive arrangements, such as employee stock options and employee stock purchase plans, are among the most effective means available to the Company of aligning the interests of employees with the objectives of shareholders generally, and of building their long term commitment to the organization.

110. The October 25, 2002 Proxy Statement was submitted to shareholders "By Order of the Board of Directors" and was signed by defendant Sorin as Secretary to Comverse.

111.    The foregoing statements set forth in the October 25, 2002 Proxy Statement were materially false and misleading because they misrepresented and/or failed to disclose that, in fact, (i) prior stock grants had been awarded with exercise prices *less* than the fair market value of the underlying shares at the date of grant; (ii) significant compensation expenses should have been recognized, but had not been; (iii) Alexander and Kreinberg's stock sales during the prior year included shares that had been acquired through the exercise of backdated options, thus constituting undisclosed additional compensation; (iv) the stock option grants had not been independently determined by the Compensation Committee, but rather were the result of collusion with the Officer Defendants; (v) the purpose of the stock option grants was not to align grantees' interests with those of the Company and its shareholders, but rather to provide them excessive windfalls; and (vi) prior stock options had been allocated to fictitious employees from a slush fund. As a result, Class Members were misled regarding the reliability of the Company's financial statements and the integrity of the Individual Defendants.

### 3Q02

112.    On November 26, 2002, the Company announced its results for the quarter ended October 31, 2002. Specifically, Comverse reported the following:

> [A] net loss, excluding non-recurring charges and gains, of $25,290,000 ($0.13 per share), compared with net income of $20,122,000 ($0.11 per diluted share) for the third quarter of fiscal 2001.
>
> The Company posted sales of $167,469,000 for the third quarter of fiscal 2002, compared with $295,032,000 for the third quarter of fiscal 2001.

113.    These results were repeated in the Company's Form 10-Q filed with the SEC on December 13, 2002, which added that SG&A expenses were $68,414,000. The 10Q and SOX Certifications contained therein were signed by defendants Alexander and Kreinberg.

114.    The foregoing statements regarding 3Q02 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $11,200,000, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements further misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

**4Q02/YE January 31, 2003**

115.    On March 12, 2003, Comverse announced its fourth quarter and fiscal 2002 year end financial results ended January 31, 2003.  For 4Q02, the Company reported:

> [A] net loss, excluding certain charges and gains, of $15,944,000 ($0.08 per share), compared with net income of $10,627,000 ($0.06 per diluted share) for the fourth quarter of fiscal 2001.
>
> The Company posted sales of $176,016,000 for the fourth quarter of fiscal 2002, compared with $265,059,000 for the fourth quarter of fiscal 2001.

116.    For the fiscal year, the Company reported that sales totaled $735,889,000, with a pre-tax loss of $123,839,000; a net loss of $129,478,000 ($0.69 per share); and SG&A expenses of $281,202,000.

117.    These results were repeated in the Company's Form 10-K filed with the SEC on April 30, 2003, which was signed by each of the Individual Defendants, and contained SOX Certifications signed by defendants Alexander and Kreinberg.

118.    The foregoing statements regarding 4Q02 and YE02 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's

SG&A expenses were understated by approximately $10,900,000 (4Q) and $44,700,000 (YE), and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements further misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

119.   The 2002 Form 10-K added that:

> The Company accounts for its option plans under the recognition and measurement principles of Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related Interpretations. Accordingly, no stock-based employee compensation cost is reflected in net income for any periods, as all options granted under the plan had an exercise price at least equal to the market value of the underlying common stock on the date of grant.
>
> ***
>
> Employee Stock Options – At January 31, 2003, 25,079,827 shares of common stock were reserved for issuance upon the exercise of options then outstanding and 9,235,083 shares were available for future grant under Comverse's Stock Option Plans, under which options may be granted to key employees, directors, and other persons rendering services to the Company. Options which are designated as "incentive stock options" under the options plans may be granted with an exercise price not less than the fair market value of the underlying shares at the date of grant….

120.   The foregoing statements set forth in the 2002 Form 10-K regarding Comverse's stock options were materially false and misleading when made because they misrepresented and/or failed to disclose that, in fact: (i) prior stock grants had been awarded with exercise prices *less* than the fair market value of the underlying shares at the date of grant; and (ii) significant compensation expenses should have been recognized, but had not been.

**1Q03**

121.    On June 3, 2003, Comverse reported quarterly results for the period ended April 30, 2003.  The Company reported sales of $180,552,000, compared to 1Q02 sales of $211,194,000, and a net loss excluding certain charges and investment gains of $7,585,000 ($0.04 per share), compared to a net loss of $8,183,000 ($0.04 per share) in 1Q02.  Including the charges and gains, the 1Q03 net loss was $5,800,000 compared to a net loss of $23,500,000 in 1Q02.

122.    Comverse's financial results for its fiscal first quarter ended April 30, 2003, were repeated in the Company's Form 10-Q filed with the SEC on June 13, 2003, which added that SG&A expenses were $62,072,000. The Form 10-Q and SOX Certifications therein were signed by defendants Alexander and Kreinberg.

123.    The foregoing statements regarding 1Q03 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $10,900,000, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

**2Q03**

124.    On September 8, 2003, Comverse announced results for the quarter ended July 31, 2003. The Company reported sales of $188,468,000, compared to 2Q02 sales of $181,210,000, and a net loss of $1,058,000 ($0.01 per share), compared to net income of $3,923,000 ($0.02 per diluted share) for 2Q02.

125.    On September 12, 2003, the Company filed its Form 10-Q for the quarter ended July 31, 2003 with the SEC, which repeated the foregoing results and added that SG&A expenses for the three months ended July 31, 2003 were $62,993,000. The Form 10-Q and SOX Certifications contained therein were signed by defendants Alexander and Kreinberg.

126.    The foregoing statements regarding 2Q03 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $10,900,000, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements further misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

**3Q03**

127.    On December 3, 2003, Comverse announced results for the quarter ended October 31, 2003. The Company reported sales of $193,843,000, compared to 3Q02 sales of $167,469,000, and a net loss of $3,437,000 ($0.02 per share) compared to a 3Q02 net loss of $79,683,000 ($0.43 per share).

128.    On December 11, 2003, the Company filed its Form 10-Q for the third quarter ended October 31, 2003 with the SEC, which added that 3Q03 SG&A expenses were $63,891,000. The Form 10-Q and SOX Certifications contained therein were signed by defendants Alexander and Kreinberg.

129.    The foregoing statements regarding 3Q03 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $10,900,000, and its income was overstated as a result of

defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

### 4Q03/YE January 31, 2004

130.    On March 10, 2004, Comverse announced financial results for fourth quarter and fiscal year ending January 31, 2004 financial results. Quarterly sales were $203,029,000, compared to 4Q02 sales of $176,016,000.  Net income was $4,928,000, ($0.02 per diluted share), compared to a 4Q02 net loss of $30,142,000 ($0.16 per share).  Annual sales were $765,892,000, compared to the prior year annual sales of $1,270,218,000.  For the fiscal year, pre-tax income was $8,580,000; with a net loss of $5,386,000, compared to a net loss of $129,478,000 for YE 2002.

131.    These results were repeated in the Company's Form 10-K filed with the SEC on April 14, 2004, which added that annual SG&A expenses were $254,376,000. The Form 10-K was signed by the Individual Defendants and contained SOX Certifications signed by defendants Alexander and Kreinberg.

132.    The foregoing statements regarding 4Q and YE03 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $2,700,000 (4Q) and $35,600,000 (FY03), and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations

and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

133.    With respect to Comverse's stock options, the Form 10-K also stated in relevant part the following:

> Stock Options – At January 31, 2004, 23,287,332 shares of common stock were reserved for issuance upon the exercise of options then outstanding and 4,928,221 shares were available for future grant under Comverse's Stock Option Plans, under which options may be granted to key employees, directors and other persons rendering services to the Company. Options which are designated as "incentive stock options" under the option plans may be granted with an exercise price not less than the fair market value of the underlying shares at the date of grant…

134.    The foregoing statements set forth in the Form 10-K regarding Comverse's stock options were materially false and misleading when made because they misrepresented and/or failed to disclose that, in fact: (i) prior stock grants had been awarded with exercise prices *less* than the fair market value of the underlying shares at the date of grant; and (ii) significant compensation expenses should have been recognized, but had not been.

**1Q04**

135.    On June 2, 2004, Comverse announced results for the quarter ended April 30, 2004.  The Company reported sales of $221,395,000, compared to 1Q03 sales of $180,552,000. Net income was $7,001,000 ($0.03 per diluted share) compared to a 1Q03 net loss of $5,819,000 ($0.03 per share).

136.    These results were repeated in the Company's Form 10-Q filed with the SEC on June 8, 2004, which added that SG&A expenses were $68,495,000. The Form 10-Q and SOX Certifications contained therein were signed by defendants Alexander and Kreinberg.

137.     The foregoing statements regarding 1Q04 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses

were understated by approximately $2,800,000, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

### 2Q04

138.    On September 8, 2004, Comverse announced results for its second quarter ended July 31, 2004.   The Company reported sales of $233,427,000, compared to 2Q03 sales of $188,468,000.  Net income was $13,327,000, ($0.06 per diluted share) compared to a 2Q03 net loss of $1,058,000 ($0.01 per share).

139.    These results were repeated in the Company's Form 10-Q filed with the SEC on September 9, 2004, which added that SG&A expenses were $71,507,000. The Form 10-Q and SOX Certifications therein were signed by defendants Alexander and Kreinberg.

140.     The foregoing statements regarding 2Q04 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $2,800,000, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements further misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

**3Q04**

141.   On December 1, 2004, Comverse announced results for its third quarter ended October 31, 2004.  The Company reported sales of $245,479,000, compared to 3Q03 sales of $193,843,000.  Net income was $15,959,000, ($0.08 per diluted share) compared to a 3Q03 net loss of $3,437,000 ($0.02 per share).

142.   These results were repeated on the Company's Form 10-Q filed with the SEC on December 8, 2004, which added that SG&A expenses were $73,767,000. The Form 10-Q and SOX Certifications therein were signed by defendants Alexander and Kreinberg.

143.   The foregoing statements regarding 3Q04 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $2,800,000, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

**4Q04/ YE January 31, 2005**

144.   On March 14, 2005, Comverse announced fourth quarter and fiscal year 2004 financial results for the fiscal year ended January 31, 2005. The Company reported 4Q04 sales of $259,141,000, compared to 4Q03 sales of $203,029,000, and 4Q04 net income of $21,043,000 ($0.10 per diluted share), compared to 4Q03 net income of $4,928,000 ($0.02 per diluted share).  For the fiscal year, sales were $959,442,000; pre-tax income was $83,156,000; and net income was $57,330,000.

145.    These results were repeated in the Company's Form 10-K filed with the SEC on April 4, 2005, which added that SG&A expenses for fiscal 2004 were $290,445,000. The Form 10-K was signed by the Individual Defendants and contained SOX certifications signed by defendants Alexander and Kreinberg.

146.    The foregoing statements regarding 4Q and FY04 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $2,800,000 (4Q) and $11,200,000 (YE), and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and integrity of the Individual Defendants.

147.    With respect to the Company's options, the 2004 Form 10-K represented that:

> Currently, the Company accounts for employee stock options in accordance with Accounting Principles Board ("APB") Opinion No. 25 and related Interpretations, which provide that any compensation expense relative to employee stock options be measured based on intrinsic value of the stock options. As a result, when options are priced at or above fair market value of the underlying stock on the date of the grant, as currently is the Company's practice, the Company incurs no compensation expense.
>
> ***
>
> Stock Options – At January 31, 2005, 22,603,387 shares of common stock were reserved for issuance upon the exercise of options then outstanding and 4,333,276 shares were available for future grant under Comverse's Stock Option Plans, under which options may be granted to key employees, directors, and other persons rendering services to the Company. Options which are designated as "incentive stock options" under the option plans may be granted with an exercise price not less than the fair market value of the underlying shares at the date of grant and are subject to certain quantity and other limitations specified in Section 422 of the

Internal Revenue Code.

***

The exercise price of each option [on subsidiary shares] is equal to the higher of the book value of the underlying shares at the date of grant or the fair market value of such shares at the date determined on the basis of an arms' – length transaction with a third party or, if no such transactions have occurred, on a reasonable basis by the Board of Directors.

148.    The foregoing statements set forth in the Form 10-K regarding Comverse's stock options were materially false and misleading when made because they misrepresented and/or failed to disclose that, in fact: (i) prior stock grants had been awarded with exercise prices *less* than the fair market value of the underlying shares at the date of grant; and (ii) significant compensation expenses should have been recognized, but had not been.

**1Q05**

149.    On June 1, 2005, Comverse announced results for the quarter ended April 30, 2005.  The Company reported sales of $272,801,000, compared to 1Q04 sales of $221,395,000; and net income of $24,261,000 ($0.11 per diluted share), compared to 1Q04 net income of $7,001,000 ($0.03 per diluted share).

150.    These results were repeated in the Company's Form 10-Q filed with the SEC on June 8, 2005, which added that SG&A expenses were $82,039,000. The Form 10-Q and SOX Certification contained therein were signed by defendants Alexander and Kreinberg.

151.    The foregoing statements regarding 1Q05 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class

46

Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

**2Q05**

152.    On September 7, 2005, Comverse reported results for its quarter ended July 31, 2005.  Comverse reported sales of $285,835,000, compared to 2Q04 sales of $233,427,000; and net income of $34,814,000 ($0.16 per diluted share), compared to 2Q04 net income of $13,327,000 ($0.06 per diluted share).

153.    These results were repeated in the Company's Form 10-Q filed with the SEC on September 8, 2005, which added that SG&A expenses were $83,444,000. The Form 10-Q and SOX Certifications therein were signed by defendants Alexander and Kreinberg.

154.    The foregoing statements regarding 2Q05 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated, and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the additional but "related" accounting manipulations and irregularities. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and integrity of the Individual Defendants.

**3Q05**

155.    On December 6, 2005, Comverse announced results for its quarter ended October 31, 2005.  Comverse reported sales of $298,966,000, compared to 3Q04 sales of $245,749,000; pre-tax income of $50,686,000; and net income of $38,295,000 ($0.18 per diluted share), compared to 3Q04 net income of $15,959,000 ($0.08 per diluted share).

156.    These results were repeated in the Company's Form 10-Q filed with the SEC on December 12, 2005, which added that SG&A expenses were $84,758,000. The Form 10-Q and SOX Certifications therein were signed by defendants Alexander and Kreinberg.

157.    The foregoing statements regarding 3Q05 results, and the SOX Certifications thereof, were materially false and misleading because, *inter alia*, Comverse's SG&A expenses were understated by approximately $2,600,000 (for the nine months ended October 31, 2005), and its income was overstated as a result of defendants' improper accounting for the backdated options. The reported revenues, expenses, reserves, backlog, income and earnings per share were further materially misstated as a result of the Accounting Claims. These material misstatements also misled Class Members regarding the reliability of the Company's financial statements, and the integrity of the Individual Defendants.

## THE TRUTH SLOWLY EMERGES

### March 14, 2006

158.    On March 14, 2006, the Company issued a press release entitled "Comverse Technology Announces Creation of A Special Committee of the Board Of Directors To Review Matters Relating To Grants Of Stock Options; Provides Selected Unaudited Financial Results." The press release in relevant part stated:

> Comverse Technology, Inc. today announced the creation of a special committee of its Board of Directors composed of outside directors to review matters relating to the company's stock option grants, including, but not limited to, the accuracy of the stated dates of option grants and whether all proper corporate procedures were followed. The committee will be assisted by independent legal counsel.
>
> Although it has not been determined whether the review will result in any restatement of the company's historical financial statements and, if so, the years affected and the amounts involved, management believes that certain restatements will likely be required. Any such restatements will not have an impact on historical revenues or operating results excluding stock option related expenses.

\*\*\*

> The company will seek to release its full results for the fourth quarter and year ended January 31, 2006 as soon as practicable after the completion of the special committee's review and the determination of whether any restatement of the company's historical financial statements is required.

159.    On the same date, Verint, Inc. and Ulticom, Inc. (publicly traded subsidiaries of Comverse), issued similar press releases which added that the option backdating had occurred in 2002 and earlier.

160.    In response to these revelations, on March 14, 2006 Comverse's stock fell $4.30 per share, losing nearly 14.7% of its value in one day, on extremely high volume of over 33.8 million shares. It closed at $24.85 per share. In contrast, the S&P Communications Equipment Index (the "Communications Index") (to which Comverse favorably compared itself in its Form 10-K) was up that day by 1.7%, resulting in a net negative return for Comverse of 16.4%.

161.    Analysts were equally critical of the Company, but downplayed the immediate impact of this first partial disclosure, believing that it was limited to the years prior to 2002, and thus lacked any likely impact on more recent results. In a report issued on March 15, 2006, Scott P. Sutherland ("Sutherland") of Wedbush Morgan Securities stated that "it appears that Comverse would approve options on a quarterly basis at the prevailing price on the approval date. However, the option grants may have occurred later in the quarter at a higher price." Furthermore, Sutherland opined that the period in question was in the late 1990s through early 2001 as Comverse's stock had "significant stock appreciation" during that time-frame. Sutherland expressed "surprise[] to see this issue slip past this company's management team, which we believe is financially savvy and believe that will be a lingering issue."

162.    The notion that the misconduct occurred well before 2006 was echoed elsewhere. In a report issued on March 14, 2006, Daniel Meron ("Meron") of RBC Capital Markets

expressed confidence in Comverse's "underlying fundamentals" and maintained "Sector-Perform with projections and target unchanged."

**March 18, 2006**

163.    On Saturday, March 18, 2006, The Wall Street Journal published an article entitled *The Perfect Payday—Some CEOs reap millions by landing stock options when they are most valuable*, focusing on the suspicious timing of options awards for executives at a number of companies.  The Journal noted that from 1996 - 2001, Comverse's options grants coincided with historically low trading dates of Comverse stock.  The Journal calculated that the odds "of such a pattern occurring by chance were around 1 in six billion."

164.    On March 20, 2008, in response to growing evidence that Comverse's executives had engaged in options backdating, the Company's stock plummeted from $24.89 to $22.87, a net decline of 8.116%, on extraordinarily high trading volume.

**April 17, 2006**

165.    On April 17, 2006, the Company issued a press release entitled "Comverse Technology To Delay 10-K Filing; Restatement Related to Stock-Based Compensation Expected."  Comverse disclosed that as a result of the irregularities relating to accounting for the Company's stock option grants, it *would be* required to restate financial results for fiscal years 2001 through 2005, as well as the first three quarters of fiscal year 2006.  In particular, the press release stated:

> The Special Committee has, however, reached a preliminary conclusion that the actual dates of measurement for certain past stock portion grants for accounting purposes differed from the recorded grant dates for such awards.  As a result of changes in measurement dates, the Company expects to record additional non-cash charges for stock-based compensation expenses in prior periods.   Based on the Special Committee's preliminary conclusion, the Company expects that (i) such non-cash charges will be material and (ii) the Company will need to restate its

50

> historical financial statements for each of the fiscal years ended
> January 31, 2005, 2004, 2003, 2003, and 2001 and for the first
> three quarters of the fiscal year ended January 2006. Such charges
> could also affect prior periods. On April 14, 2006, the Audit
> Committee of the Company's Board of Directors concluded that
> such financial statements and any related reports of its independent
> registered public accounting firm should no longer be relied upon.

166.    As such, the Company admitted for the first time that it had engaged in fraudulent

backdating, and that the accounting irregularities had impacted reported results throughout the

Class Period. Defendants sought to comfort investors by assuring them that the accounting

impact of these issues would not change the reported operating cash results of the Company:

> The Company does not expect that the anticipated restatements
> would have a material impact on its historical revenues, cash
> position or non-stock option related operating expenses.

As discussed below, these assurances turned out to be false as well.

167.    In response to the April 17, 2006 revelations, the price of Comverse shares fell on

heavy volume and closed on April 18, 2006 at $22.94 per share. The two day loss, net of the

Communications Index, was 5.3%.

168.    The total market capitalization lost by Comverse shares as a result of the March

14 and April 17, 2006 disclosures *exceeded one billion dollars*.

**May 1, 2006**

169.    On May 1, 2006, Comverse announced that defendants Alexander, Kreinberg, and

Sorin had resigned, but that they would remain as advisers to the Company.

**May 4, 2006**

170.    On May 4, 2006, Comverse filed a Form 8-K which disclosed that the Department

of Justice had subpoenaed Company records in connection with the issuance of stock option

grants between 1995 and the present. In response, on May 5, 2006, Comverse shares fell from

$24.03 to $22.98, a net decline of 4.4% on volume exceeding 7 million shares.

**June 12, 2006**

171.    On June 12, 2006, the Company announced that, because of the ongoing review of the Special Committee, the Company's 10-Q for the quarter ended April 30, 2006 would be delayed.  As a result, the Company announced that it expected to receive another letter warning about possible delisting.

172.    Investors thereupon further penalized Comverse shares given the cloud over the Company's financial condition.  Converse shares plummeted from the previous day's close of $23.57 to $20.48 (a 13% drop), on volume that exceeded 13 million. The Communications Index declined only 4.2%, for a net decline of 8.8%.

**July - November 2006**

173.    On July 31, 2006, the United States Attorney for the Eastern District of New York indicted defendants Alexander, Kreinberg and Sorin on charges of securities fraud, mail fraud and wire fraud.  That same day the SEC charged these same defendants with violating various provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934.

174.    On September 27, 2006, it was reported that Alexander had been arrested in Windhoek, Namibia by Interpol at the request of the United States government. Defendant Alexander is currently free in Namibia on N$10 million (USD $1.3 million) bail while awaiting an extradition hearing.  After more than two years of delay, the extradition hearing has yet to occur.

175.    On October 11, 2006, in a Superseding Indictment, the U. S. Attorney's Office for the Eastern District of New York charged defendant Alexander with obstruction of justice for bribery and witness tampering.  Alexander was accused of offering "millions of dollars" to buy a witness's silence. According to the indictment, Alexander offered an individual (identified as defendant Kreinberg by the *Wall Street Journal*) "millions of dollars as a bribe, for the purpose

of inducing that other person to falsely take sole responsibility for the fraud scheme."  Alexander

purportedly made offers of $2 million, then $5 million, and finally "name your price," pleading

that "there was no reason that both of them 'should go down.'"

176.   On October 24, 2006, defendant Kreinberg agreed to pay a fine of $2.4 million in

disgorgement to settle the civil fraud charges brought by the SEC.  Kreinberg also agreed to

cooperate with the U.S. Attorney's Office and pled guilty to a two-count felony Information

charging one count of conspiracy to commit securities fraud, mail fraud, and wire fraud, and one

count of securities fraud.

177.   As part of his plea agreement, Kreinberg admitted to the Court that "the Company

was in fact issuing backdated options with an exercise price lower than the fair market value on

the grant date."  Further, Kreinberg "agreed with the CEO and others at the company to assist

them in continuing the practice."  Kreinberg stated that he "was asked by the CEO to bring him a

printout of the company's trading prices over a past year period to enable him to select the 'as of'

date that would be used for the exercise price of the option grant."  Alexander then backdated

options by "selecting a date, with hindsight, to issue the options and notifying either the general

counsel or the CEO's assistant, sometimes through me, to prepare paperwork for the

compensation committee to approve the grant as of the earlier date."

178.   On November 2, 2006, defendant Sorin pled guilty to a one-count felony

Information charging conspiracy to commit securities fraud, mail fraud, and wire fraud for his

role in the stock options backdating scheme at Comverse from 1991 to 2002. According to a

press release issued by the Department of Justice, Sorin:

> "admitted that he conspired with Alexander ... to conceal that
> Comverse stock option grants were being backdated to dates when
> the stock was trading at periodic low points. Sorin also admitted
> that he approved false proxy statements and SEC filings that failed

> to properly account for the backdated options as compensation
> expense."

In his guilty plea, Sorin admitted he approved proxy statements and SEC filings that covered up the backdating scheme.

### November 14, 2006

179.     On November 14, 2006, after the market closed, Comverse issued a press release which disclosed for the first time that, in connection with the Special Committee's ongoing options investigation, "the company identified errors in the recognition of revenue related to certain contracts, errors in the recording of certain deferred tax accounts, and the misclassification of certain expenses in earlier periods."   This was in stark contrast to prior representations that "[a]ny such restatements will not have an impact on historical revenues or operating results excluding stock option related expenses," and that any restatement would be for "non-cash charges."

180.     The press release added:

> [B]ased on information provided to the company, areas of financial
> reporting under investigation include the possible misuse of
> accounting reserves and the understatement of backlog in fiscal
> 2002 and prior periods. The company previously had disclosed its
> preliminary conclusion that the actual dates of measurement for
> certain past stock option grants for accounting purposes differed
> from the recorded grant dates for such awards. The company
> substantially has completed its investigation of employee stock
> option practices and has made a preliminary determination of the
> effect on its previously issued financial statements. The Special
> Committee's investigation continues, and the company is unable to
> estimate the effect of the other accounting issues on its previously
> issued financial statements or the time it will take to complete the
> necessary restatements.

181.     Investors were stunned to learn that the Company's accounting fraud extended far beyond rigged stock options, and in fact impacted fundamental metrics of operations, *i.e.,* revenues and expenses, which in turn inflated earnings.

182.  The next day, Comverse common stock fell $2.95 or 14.2% and closed at $17.69 on extremely high trading volume of over 58.2 million shares. In contrast, the Communications Index rose 0.4%, for a net decline of 14.6%, which was a material amount.

183.  On November 15, 2006, in response to these new revelations, Canadian Imperial Bank of Commerce ("CIBC") lowered its price target for Comverse stock, reasoning that the latest announcement had increased the Company's "risk profile" because of "lack of visibility into the P&L."  Daniel Ives at FBR Research commented "this latest accounting revelation adds further uncertainty to the name and its potential delisting status" and that these latest accounting problems "could be the 'straw that broke the camel's back.'"  An analyst at Baird U.S. Equity Research similarly opined that the additional accounting problems would create "additional uncertainty" and "possible delisting is much more likely,...."

184.  On November 17, 2006, Comverse filed a Form 8-K with the SEC which stated, "that due to the accounting issues specified above (detailed in ¶¶ 171-72, *supra*), in addition to stock option grant practices, the Company's financial statements and any related reports of its independent registered public accounting firm should no longer be relied upon."

### December 2006 - January 2007

185.  On December 6, 2006, Gradient Analytics issued a report on backdating practices by executives in major companies. In the report, Gradient stated that Defendant Alexander "likely avoided paying taxes on $8.42 million by utilizing exercise backdating. Alexander reported an exercise of 675,000 (split-adjusted) options to the SEC on October 9, 1998; on that day, the stock sold for $10, just $.02 off the quarterly low from the previous day. The stock later climbed 129.2 percent by the time the SEC required Alexander to report the exercise option."

186.  On December 11, 2006, Comverse disclosed a further delay in filing its quarterly report due to:

> [T]he company's ongoing investigation of past stock option grants, including its evaluation of actual dates of measurement for certain grants which differ from the recorded grant dates, and of additional accounting issues, including errors in the recognition of revenue related to certain contracts, errors in the recording of certain deferred tax accounts and the misclassification of certain expenses in earlier periods as well as the possible misuse of accounting reserves and the understatement of backlog for fiscal 2002 and prior periods.

187.    On January 10, 2007, Sorin agreed to pay $3.1 million to settle SEC's civil charges that he conspired with Kreinberg and Alexander in the fraudulent scheme of backdating the Company's stock option grants.

188.    On January 31, 2007, the Company announced that the NASDAQ Listing and Hearing Review Council decided to delist Comverse from NASDAQ. Comverse is now quoted in the "Pink Sheets" under the trading symbol "CMVT.PK."

**March 23, 2007**

189.    On March 22, 2007, Comverse issued a press release updating its internal investigation and quantifying the impact of the improper backdating of options for the period January 1, 1991 through October 31, 2005 (referred to by the Company as the "Restatement Period").

190.    With respect to the backdating of options, the Company stated:

> Based on Phase I of the Special Committee's investigation of the company's stock option practices, which is substantially concluded, the company determined that the actual dates of measurement for certain past stock option grants for accounting purposes differed from the recorded grant dates for such awards during the Restatement Period, and also has identified other accounting errors related to stock-based compensation.   As a result, the company has recorded incremental cumulative stock-based compensation expense and related withholding and income tax effects in the aggregate of approximately $314 million for the Restatement Period, including an accrual of approximately $49 million for the estimated liability for withholding taxes and related penalties and interest.   Stock-based compensation expense and

related withholding and income tax effects for the nine months ended October 31, 2005 was approximately $2.6 million which was including in the aforementioned $314 million for the Restatement Period.

191.    With respect to the additional but "related" accounting manipulations and irregularities, the Company stated:

> The Special Committee is continuing its Phase II investigation, announced in mid-November 2006, of other financial and accounting matters, including errors in the recognition of revenue related to certain contracts, errors in the recording of certain deferred tax accounts and the misclassification of certain expenses in earlier periods.  In addition, based on information provided to the company, areas of financial reporting under investigation include the possible misuse of accounting reserves and the understatement of backlog in fiscal 2002 and prior periods. Accordingly, additional information discovered in the investigation and the subsequent reviews or audits by the company's independent registered public accounting firm may result in adjustments to the financial information presented herein, and such adjustments could be material.  The company believes that the aggregate historical sales and total cash flows as previously reported are not likely to materially change.

192.    Indicative of the scope of the fraud, the Company also disclosed that as of March 22, 2007, the total cost of the Special Committee's investigation related expenses was approximately $68 million.

**The Special Committee Report**

193.    On January 29, 2008, the Company filed a Form 8-K containing a summary of the Special Committee's final Report.  According to the Report, two "separate, ***but related***, investigations [conducted by the Special Committee] confirmed the existence of option backdating and earnings manipulation."  (Emphasis supplied.)  Equally important were the following admissions:

> The Special Committee found that Alexander, Kreinberg and Sorin were able to accomplish the backdating of Company options in part because of inadequate internal control over financial

> reporting, inadequate Board oversight and a corporate culture that discouraged questioning of senior management. The earnings manipulation found by the Special Committee was also accomplished due to similar deficiencies in internal control over financial reporting and corporate culture.
>
> . . . .
>
> [T]he Special Committee found an inappropriate tone at the top with Alexander and Kreinberg not tolerating questions being raised concerning any decisions by them about practices, procedures, or substantive accounting issues thereby resulting in a corporate culture not conducive to integrity and transparency of appropriate financial reporting**.** Thus, the Special Committee found Alexander and Kreinberg were able to backdate option grants and manipulate the Company's earnings and financial results by overriding those internal controls that did exist at Comverse and CNS.

194.    The first investigation ("Phase I") began in March 2006 and addressed the options backdating scheme:

> [B]etween 1991 and 2001, almost 54 million stock options (issued via 29 grants to 5,386 grantees) were backdated to obtain advantageous exercise prices, with the knowledge and participation of the Company's former Chairman and Chief Executive Officer, Jacob "Kobi" Alexander Alexander"), the Company's former director and General Counsel, William Sorin ("Sorin") and, at times, the Company's former Executive Vice President and Chief Financial Officer, David Kreinberg ("Kreinberg"). The recipients of such grants ranged from low-level employees to senior executives, but no backdated grants were made to non-employee directors. The difference between the fair market value of the Company's stock on the proper measurement date and the fair market value of the Company's stock on the "as of" grant date for all exercised backdated options amounted to $71,872,650, including $6,435,750 for Alexander, $1,052,734 for Kreinberg, and $1,010,424 for Sorin.

195.    The second "related" investigation ("Phase II") began in November 2006 and concerned the accounting irregularities related to the manipulation of the Company's reserves, expenses and back log.

196.    According to the Appendix A of the Report:

> The Phase II investigation focused on the Company's

58

historical accounting systems, procedures, and controls, with particular attention paid to the sufficiency of corporate controls and processes.  The investigation revealed weaknesses in the Company's accounting and disclosure controls and procedures during the period covered by the investigation.  In conjunction with inappropriate earnings management practices of former senior officers of the company, these weaknesses contributed to inaccurate reporting for reserves and accruals, expense reclassifications and backlog disclosures.

197.    In addition, the Report states that the Special Committee found that Comverse's financial results "were intentionally misstated as a way of aligning the Company's performance with Wall Street expectations" and "**to portray Comverse as a company with steady, measured growth.**" (emphasis added). The Special Committee further concluded that the financial results were misstated from "at least 1996 through 2003," and that the accounting manipulations continued to have an "impact" on Comverse's financial results through January 31, 2006.

198.    The Report further acknowledged that "to 'smooth out' reported earnings, Kreinberg routinely overrode existing internal controls and directed subordinates in the finance departments of various Comverse subsidiaries to make unsupported quarter-end adjustments in at least two areas."

199.    The first area involved manipulation of reserves.  According to the Report, "to achieve the desired financial metrics, Kreinberg and Alexander directed the creation of excess reserves that later could be (and were) released into income and kept running track of the 'excess' or 'cushion' in dozens of reserve accounts."  The Report continued: "The Special Committee determined that this practice had a significant impact on the Company's income statements and consequently, a restatement of the Company's financial statements is required." The Report acknowledges that the reserve manipulations continued to have an "impact" on reported financial results through January 31, 2006.

200.    The second area involved the improper reclassification of expenses.  According to the Report, "Kreinberg directed the reclassification of certain expenses."  These manipulations "did have the effect of presenting more consistent operating and performance trends. These reclassifications typically involved: (a) Cost of Goods Sold, (b) Research and Development Costs, and (c) Selling, General and Administrative expenses."  Furthermore, "because the expense categories involved trends and metrics that are tracked by Wall Street analysts and are used to compute performance ratios for the Company, their manipulation provided a misleading portrait of the Company's operating performance."

201.    The Report also described how the sales backlog was manipulated to influence the market on a key metric of the Company's financial health:

> [A]t the Corporate level, Kreinberg or a subordinate directed by Kreinberg, repeatedly made unsupported downward adjustments to the Company's sales backlog. Although the sales backlog (which the Company defines as signed purchase orders or firm customer commitments that have not yet been recognized as revenues as of the balance sheet date, but are expected to be recognized in the next 12 months) was not reported in the Company's quarterly financial statements, it was reported in the annual reports filed with the SEC, and was discussed regularly in quarterly earnings conference calls with analysts.

202.    In the course of the Phase II investigation, the Special Committee found documentary evidence to support proffers made by Kreinberg after his guilty plea in October 2006:

> Kreinberg said Alexander wanted the Company's financial statements to indicate it was well-managed and that its results were predictable. Therefore, Kreinberg said Alexander directed him to make adjustments to quarter-end reserve accounts to create desired earnings per share, and to move expenses from one category to another as a way of ensuring that the Company's expenses would appear to grow in a measured and consistent manner. Finally, Kreinberg said that Alexander directed him to adjust downward the sales backlog figure that the Company reported in its annual reports on Form10-K and to analysts in order to avoid potential

Wall Street concerns that the sales backlog was growing too rapidly.

203.    The Report revealed extensive details concerning the manipulation of reserves at operating subsidiaries of Comverse, including CNS, which accounted for approximately 95% of Comverse's consolidated pre-tax net income:

> CNS had its own finance and human resources departments that were formally overseen by the head of CNS, but as a matter of practice, the finance operations for CNS were overseen by Kreinberg. Together with Alexander, who maintained tight control over the operations of Comverse and its subsidiaries, Kreinberg was able to sidestep the formal lines of reporting that had been established within the CNS Finance Department, and the Special Committee found he directed or encouraged subordinates at CNS to exaggerate the need for specific reserves and accrual items and to adjust accounts without proper support to achieve certain earnings per share and other desired financial goals in violation of U.S. Generally Accepted Accounting Principles ("GAAP").

> Comverse reported consolidated financial results for itself and its subsidiaries based on a quarterly reporting package prepared by each of its reporting units. In addition to preparing the CNS reporting package, CNS's Wakefield office prepared a separate package of schedules and spreadsheets, entitled the "CNS Financial Results Package" (the "CNS Package") which included a spreadsheet entitled "CNS Reserve Analysis." The CNS Reserve Analysis, contained a column entitled "Reserve Balance" that represented the balance for major reserve and accrual accounts for each CNS unit, and a "hidden column" entitled "Real Reserve," which tracked the portion of the reserve balance that represented the "excess," "buffer" or "cushion" in the respective reserve or accrual account.

> The CNS Package was accompanied by a narrative in which the discussion of reserve account balances included a description of how much of each reserve account or item was "excess," "buffer" or "cushion."

> Once Kreinberg received and reviewed this information, he typically held telephone conferences in which he dictated adjustments reclassifying expenses and increasing or decreasing reserves.

> As Kreinberg adjusted the CNS Financial Statements, he also

maintained (for a period of time) a "scorecard" that reflected the true financial condition of the Company by tracking the portions of the reserve and accrual accounts that were "excess" (the "Kreinberg Scorecard"). The Kreinberg Scorecard also contained an additional column labeled "take back," that represented the amount of the "excess" that could be taken back into income. The "excess" reserve balances for CNS included in the "Real Reserve" column of the Kreinberg Scorecards generally tied to the "excess" reserve balance in the "Real Reserve" column on the CNS Reserve Analysis, and the reserve balance listed in the unmarked column on the Kreinberg Scorecards generally tied to the balances reported on the Company books.

The Kreinberg Scorecards were created and maintained in Microsoft Excel which allowed the "real reserve" columns to be included in a "hidden" column.

204.   The Report also details manipulations of CNS expenses, particularly Sales, Cost of Goods Sold ("COGS"), Research and Development Costs ("R&D"), and Selling, General and Administrative Expenses ("SG&A").

205.   According to the Report, these manipulations "involved moving expenses from one category to another," and were significant because "the expense categories involved trends and metrics that are tracked by Wall Street analysts and are used to compute performance ratios for the Company, their manipulation provided a misleading portrait of the Company's operating performance."

206.   The Report notes that the Special Committee found "abundant evidence that demonstrated the routine manipulation of expense classifications. Kreinberg himself admitted that he directed the CNS Finance Department to make the quarterly changes Alexander and he wanted to be made among COGS, R&D, and SG&A and Finance Department personnel corroborated this admission."

207.    The Special Committee acknowledges in the Report that it did not complete a full review of all of the irregularities that arose during the Class Period.  For example, with respect to the review of revenue recognition irregularities, the Report provides:

> [T]he Special Committee noted instances of missing supporting documentation for several transactions. In addition, the Special Committee was not able to interview employees with direct involvement with such transactions as they were no longer employed by the Company.
>
> Accordingly, the Special Committee advised the Company that it should review the Company's compliance with SOP 97-2 for periods beginning with its effective date through January 31, 2003. On November 5, 2007, the Company announced that in connection with the ordinary audit work for its fiscal year 2006 financial statements, and not associated with the Special Committee's investigation, the Company had undertaken an evaluation of its application of SOP 97-2, specifically relating to VSOE."

Thus, the Report does not include findings from the review of revenue recognition irregularities associated with, *inter alia*, violations of SOP 97-2 that occurred during the Class Period, which -- upon the advice of the Special Committee -- became part of the "restatement process."  Although the Company had advised the market that it had targeted "the end of January 2008 for completion of our accounting restatements and associated filings," it acknowledged on November 5, 2007, that such filings would "be delayed as a result of an evaluation of its revenue based on the application of Statement of Position (SOP) 97-2."   As of the filing of this Complaint, Comverse has not filed its restated financial statements nor disclosed to the market any indication of the impact of its violations of SOP 97-2 apart from the fact that it must restate prior financials based on such revenue recognition accounting irregularities.

208.    The Report does not include the impact of any accounting irregularities at Verint and Ulticom, "majority-owned subsidiaries of Comverse" that "are consolidated into the financial statements of Comverse."   According to the Report, Verint and Ulticom each

"conducted independent investigations of stock option grants and alleged earnings manipulation," and are "engaged in an evaluation of [their] recognition of revenue based on the application of [SOP 97-2.]"

## CLASS ACTION ALLEGATIONS

209.    Lead Plaintiff, the Menorah Group, brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities that purchased or otherwise acquired Comverse common stock between April 30, 2001 and November 14, 2006, both dates inclusive (the "Class Period"), and who were damaged by defendants' misconduct (the "Class").   Excluded from the Class are defendants herein; the officers and directors of the Company at all relevant times; all grantees of Comverse stock options prior to 2003; and members of any of the foregoing excluded individuals' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

210.    The members of the Class are so numerous that joinder of all members is impracticable.   As of the close of the Class Period, there were 202 million shares of Comverse common stock outstanding.   Throughout the Class Period, Comverse common shares were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.   Record owners and other members of the Class may be identified from records maintained by Comverse or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

211.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

212.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

213.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;
- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Comverse;
- whether the Individual Defendants caused Comverse to issue false and misleading statements during the Class Period;
- whether defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the market prices of Comverse securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

214.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for Class Members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

215.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- the securities of the Company traded in an efficient market;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased their Comverse stock between the time the defendants failed to disclose or misrepresented material facts and the time the true facts disclosed, without knowledge of the omitted or misrepresented facts.

216.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants For Violations of
Section 10(b) And Rule 10b-5(b) Promulgated Thereunder**

217.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218.   This Count is asserted against all defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

219.   During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statement made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud investors in connection with the purchase and sale of securities. Such schemes and artifices were intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class Members, as alleged herein; (ii) artificially inflate and maintain the market price of Comverse's common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Comverse's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

220.    Pursuant to the fraudulent scheme, the Individual Defendants caused Comverse to issue the statements set forth in ¶¶ 70-157, *supra*, which were materially false and misleading for the reasons set forth in ¶¶ 50-69, *supra*.

221.    Defendants acted with knowledge or reckless disregard for the falsity of the statements issued during the Class Period, as detailed below:

**<u>Comverse</u>**

(a)    As detailed above, Comverse's senior executive officers engaged in a fraudulent scheme to improperly account for the windfalls they received from backdated options, and to otherwise inflate Comverse's reported results by manipulation of the accounting for reserves, backlog, revenues and expenses. Two of the Officer Defendants have pled guilty to securities fraud. In the Report, Comverse has acknowledged intentional misconduct by its senior officers as to both backdating and earnings manipulation. As senior controlling officers of the Company, their misconduct and knowledge is imputed to the Company.

(b)    APB ¶ 38 requires a company to restate its prior results "if a change or correction has a ***material*** effect on income before extraordinary items or net income . . . ." Thus, by announcing that it will restate its financial results for over five years, Comverse has

admitted that the "facts" requiring the restatement of its accounting for stock option related compensation costs, revenues, expenses, reserves, backlog and income existed at the time the financial statements were originally issued.  These "facts" were fundamental to the Company's operation, and therefore known or recklessly ignored.

(c)     Moreover, given the scope of the restatements, which span over 5 years and represent a significant portion of previously reported results, the Company's knowledge and/or recklessness is self-evident.

**The Officer Defendants**

(d)     The Officer Defendants personally orchestrated the fraudulent backdating, and were its primary beneficiaries. They were motivated to engage in the fraudulent scheme by greed.  Kreinberg and Sorin have pled guilty to securities fraud relating to the stock option backdating. Alexander has been indicted for his participation in the fraudulent scheme.

(e)     Alexander's meticulousness in reviewing the Company's SEC filings and financial statements was widely known within Comverse. He reviewed each draft, flagging typographical and other errors.  Alexander bragged to Company employees about his scrutiny saying, "How many CEOs do you know who read every word of the footnotes?"

(f)     As detailed above, Alexander was the chief architect of the Company's backdating. Alexander, along with Kreinberg, "cherry-picked" the exercise price for the stock options with hindsight.  Alexander directed the creation of the illegal Phantom/Fargo account which used names of fictitious employees in order to create a ready supply of options to hand out whenever the Officer Defendants so desired.

(g)     Alexander and Kreinberg selected the dates for the grant options to coincide with historic lows, knowing full well that the options had not been approved for those

dates.

(h)     Sorin fabricated unanimous consent forms to provide the facade of legitimacy for the fraudulent option grants.

(i)     Sorin drafted and approved the Company's proxy statements, annual and quarterly filings, and stock option plans detailed above.  Kreinberg participated in drafting the financial portions of these filings.  Alexander reviewed all of these filings. Each knew that the representations regarding the exercise prices of the stock option were false and misleading given their involvement with the date selection and the Company's options approval process.

(j)     Indicative of their fraudulent intent, Alexander and Kreinberg sought to conceal the existence of the Phantom/Fargo slush fund:

(1)     On or about April 29, 2002, Alexander and Kreinberg closed the Phantom/Fargo account, in anticipation of the passage of the Sarbanes-Oxley Act.  Thereafter, on or about March 10, 2006, shortly before the Company announced the appointment of a Special Committee to investigate Comverse's stock option grants, Kreinberg accessed Equity Edge to alter data regarding the slush fund grants.  The computer system showed that the Phantom/Fargo grants were cancelled on April 29, 2002 and June 20, 2002.  Kreinberg, using Fran Rail's password, entered the computer system, and changed the cancellation date to reflect only June 20, 2002, thereby making the Phantom/Fargo options blend in with the millions of options that were cancelled in June 2002, as part of the Company's Stock Option Exchange Program ("SOEP") repricing program.

(2)     Kreinberg, however, was forced to put the April 29, 2002 date back in the system when he realized that the computer system would show that the Phantom/Fargo account had been accessed in March 2006. Accordingly, Kreinberg directed Fran

Rail to change all entries in Equity Edge to show that all accounts, not just the Phantom/Fargo Account, had been accessed on the same day.

(k)     Threatened with exposure of his crimes and the likelihood of going to jail, Alexander initially sought to bribe Kreinberg into taking the blame for everything by offering Kreinberg $2 million to take the fall.  Later, he upped the ante to $5 million, and finally said "name your price," explaining that there was no reason why both of them "should go down." When his efforts at bribing Kreinberg failed, Alexander fled the country to avoid prosecution.

(l)     Alexander and Kreinberg signed the SOX certifications attesting to their review and knowledge of all facts going to the accuracy of the financial results and the adequacy of Comverse's internal controls.

(m)     According to the Special Committee Report,

(1)     Alexander, Kreinberg and Sorin engaged in intentional misconduct in the backdating of stock options and failing to properly account for the backdated options; and,

(2)     Alexander and Kreinberg engaged in intentional misconduct as to the additional and "related" accounting manipulations, as well as in creating the slush fund.

(n)     Sorin was a close confidante of Alexander and Kreinberg during the Class Period.  Sorin has admitted, and the Report confirms, his intentional misconduct as to all aspects of the backdating fraud, which was the motivation for the manipulation of the Company's financial statements and accounting irregularities as well as the means for maximizing the return on the backdated options.  In this context, his involvement, knowledge and/or reckless disregard of the additional and "related" accounting manipulations can be strongly inferred.

**The Compensation/Audit Committee ("CAC") Defendants**

(o)     As members of the Compensation Committee, the CAC Defendants were

70

empowered to grant stock options.  Accordingly to the Compensation Committee Charter, the Compensation Committee's duties included:

> 1)      Determining salaries and incentive compensation for the Company's executive officers; and
>
> 2)      Administering the issuance of awards under the Company's stock option plans and such other compensation plans as may be assigned by the Board from time to time....

(p)      Consistent with the Compensation Committee Charter, each stock option Plan gave sole authority to the Compensation Committee to: (1) select the employees that would receive awards under the plans; (2) determine the type and amount of stock options to be awarded to such employees; and (3) set the exercise price of each stock option.

(q)      The CAC Defendants knew that Comverse's stock option Plans and By-Laws required that they (i) approve the award of options; and (ii) award options "at the market price" on the date of approval. The CAC Defendants knowingly and/or recklessly participated in the fraudulent scheme by signing unanimous consent forms well after the date on which the grants had been made, without dating the forms or determining the basis for the "as of" date selected.  Moreover, quite often, most of the information they received in connection with the "approval process" took place in short telephone calls from the Officer Defendants, further indicative of their complicity in the scheme and/or reckless indifference to the truth.

(r)      With regard to the slush fund, the Compensation Committee members failed to determine whether all the grantees were in fact employees, and failed to tally the grants to determine whether all had been accounted for.

(s)      As members of the Audit Committee, the CAC Defendants were charged with reviewing Comverse's financial statements on a quarterly and annual basis and meeting with outside auditors to assure the Audit Committee that the Company's internal controls were

adequate and its public statement accurate.  In particular, the Audit Committee Charter provided that:

> The Audit Committee (the "Committee") shall assist the Board of Directors (the "Board" or the "Board of Directors") of Comverse Technology, Inc. (the "Company") in fulfilling certain of its responsibilities to oversee management regarding: (i) overseeing the conduct and integrity of the Company's financial reporting process to any governmental or regulatory body, the public or other users thereof: (ii) overseeing the Company's compliance with legal and regulatory requirements…. (iv) reviewing the performance of the Company's internal audit function, if applicable, and its systems of internal accounting and financial and disclosure controls….

> In discharging its oversight role, the Committee is authorized: (i) to investigate any matter that the Committee deems appropriate, with access to all books, records, facilities and personnel of the Company….

(t)      The CAC Defendants recklessly failed to assure themselves of the appropriateness of the option grants, turned a blind eye to the accuracy of Comverse's financial reports, and gave their imprimatur to the issuance of materially false and misleading financial statements.

### The Individual Defendants Collectively

(u)      The Individual Defendants, as senior executives and/or directors of Comverse, were each privy to non-public information regarding the Company's stock option backdating scheme, improper revenue recognition, misclassification of certain expenses, and other information concerning the Company from access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other documents provided to them in connection therewith.  Because of their possession of and access to such information, the Individual Defendants knew that the statements alleged herein were false and misleading, and/or

were deliberately reckless with respect to the truth and falsity of such statements.

(v)     Each of the Individual Defendants was also intimately involved with the Company's financial reports by virtue of their positions as Chief Executive Officer, Chief Financial Officer, drafters of SEC filings, and membership on the Audit Committee. Each Individual Defendant had a duty to ensure that the financial statements were accurate when they signed SEC filings and/or executed certifications pursuant to Sarbanes-Oxley attesting to the accuracy of those statements, the falsity of which the Individual Defendants knew or recklessly ignored.

222.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements issued by Comverse. As officers and directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Comverse's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Comverse common stock was artificially inflated throughout the Class Period.

223.   The Individual Defendants should also be treated as a group for pleading purposes and presumed to have collectively published SEC filings, press releases, and other announcements that were published in the Company's name. Each is an officer and/or director of Comverse, and by virtue of such high level position within the Company, directly participated in the management of the Company, was directly involved in the day to day operations of the

Company at the highest levels, and was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein.

224.     In ignorance of the adverse facts concerning Comverse's business and financial condition, Plaintiffs and the other members of the Class purchased Comverse common stock at artificially inflated prices and relied upon the price of the stock, the integrity of the market and statements disseminated by defendants, and were damaged thereby.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased said shares or would not have purchased them at the inflated prices that were paid.

225.     Moreover, Plaintiffs and the other members of the Class were damaged upon the disclosures of the options backdating fraud, as well as the materialization of the risk of the accounting irregularities associated with the options backdating and the additional but "related" accounting manipulations and irregularities, which were revealed in a series of disclosures beginning on March 13, 2006 and have continued through the date of the filing of this Complaint.

226.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10-5(b) promulgated thereunder.

## COUNT II

### Against Sorin for Violations of Section 10(b) of the Exchange Act And Rule 10b-5(a) & (c)

227.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

228.    This Count is asserted against Defendant Sorin, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a)&(c) promulgated thereunder by the SEC.

229.    Sorin knowingly approved, among other things: (i) the back dated stock options; (ii) the statements issued by Comverse that falsely represented that the exercise prices for the stock options had not been lower than the market price on the grant dates; (iii) the improper accounting for these backdated options; (iv) the improper accounting for Comverse's revenues, expenses, reserves, backlog, income and tax deferred assets; and (v) Comverse's issuance of the materially misleading statements set forth in ¶¶ 70-157, *supra*.

230.    Accordingly, Sorin directly participated in a "device, scheme or artifice to defraud" and "an act, practice or course of business which operate[d] . . . as a fraud or deceit" upon Class Members.

231.    By reason of the conduct alleged herein, Sorin violated Section 10(b) of the Exchange Act and Rule 10(b)-5(a) and (c), promulgated thereunder by the SEC.

## COUNT III

**Against the Individual Defendants**
**For Violations of Section 20(a) of the Exchange Act**

232.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

233.    (a)    During the Class Period, defendant Alexander participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Comverse's business affairs.  Because of Alexander's senior positions, he knew the adverse non-public information about Comverse's options backdating, "slush fund," additional but "related" accounting manipulations and irregularities, and false financial statements.

(b)     As an officer of a publicly owned company, Alexander had a duty to disseminate accurate and truthful information with respect to Comverse's financial condition and results of operations, and to correct promptly any public statements issued by Comverse which had become materially false or misleading.

(c)     Because of his position of control and authority as a senior officer and director of Comverse, Alexander was able to, and did, control the contents of the various reports, press releases and public filings which Comverse disseminated in the marketplace during the Class Period concerning the Company's results of operations.   Throughout the Class Period, Alexander exercised his power and authority to cause Comverse to engage in the wrongful acts complained herein. Alexander, therefore, was a "controlling person" of Comverse within the meaning of Section 20(a) of the Exchange Act.   In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Comverse common stock.

234.    (a)     During the Class Period, defendant Kreinberg participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Comverse's business affairs.   Because of Kreinberg's senior positions, he knew the adverse non-public information about Comverse's options backdating, "slush fund," additional but "related" accounting manipulations and irregularities, and false financial statements.

(b)     As an officer of a publicly owned company, Kreinberg had a duty to disseminate accurate and truthful information with respect to Comverse's financial condition and results of operations, and to correct promptly any public statements issued by Comverse which had become materially false or misleading.

(c)     Because of his position of control and authority as a senior officer of Comverse, Kreinberg was able to, and did, control the contents of the various reports, press

releases and public filings which Comverse disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, Kreinberg exercised his power and authority to cause Comverse to engage in the wrongful acts complained herein. Kreinberg, therefore, was a "controlling person" of Comverse within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Comverse common stock.

235.    (a)    During the Class Period, defendant Sorin participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Comverse's business affairs.  Because of Sorin's senior positions, he knew the adverse non-public information about Comverse's options backdating, additional but "related" accounting manipulations and irregularities, and false financial statements.

(b)    As an officer and director of a publicly owned company, Sorin had a duty to disseminate accurate and truthful information with respect to Comverse's financial condition and results of operations, and to correct promptly any public statements issued by Comverse which had become materially false or misleading.

(c)    Because of his position of control and authority as a senior officer and director of Comverse, Sorin was able to, and did, control the contents of the various reports, press releases and public filings which Comverse disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, Sorin exercised his power and authority to cause Comverse to engage in the wrongful acts complained herein. Sorin, therefore, was a "controlling person" of Comverse within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Comverse common stock.  In this capacity,

he participated in the unlawful conduct alleged which artificially inflated the market price of Comverse common stock.

236.    (a)    During the Class Period, defendant Friedman participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Comverse's business affairs.  Because of Friedman's senior positions as Chairman of the Compensation Committee and a member of the Audit Committee, he knew the adverse non-public information about Comverse's options backdating and false financial statements.

(b)    As a director of a publicly owned company, Friedman had a duty to disseminate accurate and truthful information with respect to Comverse's financial condition and results of operations, and to correct promptly any public statements issued by Comverse which had become materially false or misleading.

(c)    Because of his position of control and authority as a director of Comverse, Friedman was able to, and did, control the contents of the various reports, press releases and public filings which Comverse disseminated in the marketplace during the Class Period concerning the Company's results of operations.   Throughout the Class Period, Friedman exercised his power and authority to cause Comverse to engage in the wrongful acts complained herein. Friedman, therefore, was a "controlling person" of Comverse within the meaning of Section 20(a) of the Exchange Act.   In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Comverse common stock.

237.    (a)    During the Class Period, defendant Hiram participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Comverse's business affairs.  Because of Hiram's senior positions as a member of the

Compensation Committee and Chairman of the Audit Committee, he knew the adverse non-public information about Comverse's options backdating and false financial statements.

(b)     As a director of a publicly owned company, Hiram had a duty to disseminate accurate and truthful information with respect to Comverse's financial condition and results of operations, and to correct promptly any public statements issued by Comverse which had become materially false or misleading.

(c)     Because of his position of control and authority as a director of Comverse, Hiram was able to, and did, control the contents of the various reports, press releases and public filings which Comverse disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, Hiram exercised his power and authority to cause Comverse to engage in the wrongful acts complained herein. Hiram, therefore, was a "controlling person" of Comverse within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Comverse common stock.

238.     (a)     During the Class Period, defendant Oolie participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Comverse's business affairs.  Because of Oolie's senior positions as a member of the Compensation Committee and the Audit Committee, he knew the adverse non-public information about Comverse's options backdating and false financial statements.

(b)     As a director of a publicly owned company, Oolie had a duty to disseminate accurate and truthful information with respect to Comverse's financial condition and results of operations, and to correct promptly any public statements issued by Comverse which had become materially false or misleading.

(c)     Because of his position of control and authority as a director of Comverse, Oolie was able to, and did, control the contents of the various reports, press releases and public filings which Comverse disseminated in the marketplace during the Class Period concerning the Company's results of operations.  Throughout the Class Period, Oolie exercised his power and authority to cause Comverse to engage in the wrongful acts complained herein. Oolie, therefore, was a "controlling person" of Comverse within the meaning of Section 20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of Comverse common stock.

239.     As set forth in ¶¶ 219 (a)-(v), supra, (and without conceding the necessity of such pleading) the Individual Defendants knew the statements issued by Comverse during the Class Period were materially false and misleading.

240.     By reason of the above conduct, Defendants Alexander, Kreinberg, Sorin, Friedman, Hiram, and Oolie are each jointly and severably liable pursuant to § 20(a) of the Exchange Act for Comverse's primary violations of the Exchange Act as alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, and certifying the Lead Plaintiff as the Class representative for all claims, and Plaintiff Prystowsky as representative for the proxy related claims;

B.     Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Rescinding the various stock option plans that were subject to the Proxy

Statements referenced herein;

D.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

E.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated:  March 10, 2009

By:   _s/ Patrick V. Dahlstrom_                     .
          Patrick V. Dahlstrom

Stanley M. Grossman
Marc I. Gross
Shaheen Rushd
Murielle J. Steven Walsh
Jeremy A. Lieberman
Fei-Lu Qian
**POMERANTZ HAUDEK BLOCK**
   **GROSSMAN & GROSS LLP**
100 Park Avenue
New York, New York 10017
Telephone: 212-661-1100
Facsimile: 212-661-8665

One North LaSalle Street
Suite 2225
Chicago, Illinois 60602
Telephone: 312-377-1181
Facsimile: 312-377-1184

**Attorneys for Lead Plaintiff The Menorah**
**Group and Plaintiff Steven Prystowsky**