UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

| | |
|---|---|
| IN RE COMVERSE TECHNOLOGY, INC. SECURITIES LITIGATION | **MEMORANDUM** 06-CV-1825 (NGG)(RER) |

------------------------------------------------------------------x

NICHOLAS G. GARAUFIS, United States District Judge.

The court issues this Memorandum to explain its award of fees in the Judgment and Order of Dismissal entered in this case on June 23, 2010.

## I. BACKGROUND

The court assumes the parties' familiarity with the background of this case, and only recites the facts necessary to address Lead Counsel's motion for an award of attorneys' fees (Docket Entry # 331).

This case arises out of allegedly unlawful stock option awards made to officers of Comverse Technology, Inc. ("Comverse"). Beginning on April 16, 2006, Comverse stockholders filed five putative class actions against Comverse and certain Comverse officers (collectively, "Defendants"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. On March 2, 2007, the court consolidated these actions and appointed Menora Mitvachim Pension Funds, Ltd. and Menora Mitvachim Insurance Co. (the "Menora Group") as Lead Plaintiff, in accordance with the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a)(3)(B)(I). (Docket Entry # 65.) The Menora Group is represented by Pomerantz Haudek Grossman & Gross LLP ("Lead Counsel").

On December 16, 2009, the Menora Group entered into a Stipulation of Settlement with Defendants. (Docket Entry # 323 ("Stipulation").) Under the Stipulation, Comverse agreed to pay a total of $165 million to a class consisting of all purchasers of Comverse common stock during the period April 30, 2001 through January 29, 2008, in exchange for the release and discharge of all claims based upon Comverse's acts during the class period. (See Stipulation ¶¶ 1.8, 2.2, 5.2; Declaration of Patrick V. Dahlstrom in Support of Final Approval of Settlement (Docket Entry # 333) ("Dahlstrom Decl.") ¶ 97.) Defendant Kobi Alexander, a former Comverse officer, agreed to pay $60 million to the class, resulting in a total recovery of $225 million (the "Settlement Amount"). (Stipulation ¶ 2.3.)

On April 2, 2010, the court entered an order preliminarily approving the settlement, certifying a class for settlement purposes, and scheduling a fairness hearing. (Docket Entry # 329 ("Preliminary Approval Order").) The Preliminary Approval Order directed Lead Counsel to provide notice of the settlement and the fairness hearing to potential class members. (Preliminary Approval Order ¶ 9.) Through a claims administrator, Lead Counsel mailed a Notice of Pendency and Settlement of Class Action to more than 204,000 potential class members, and also posted summary notice in the *Wall Street Journal* and in the Israeli financial paper *Globes*. (See Pls. Reply Mem. in Opposition to Objections (Docket Entry # 342) ("Pls. Reply Mem.") 1); Affidavit of Michael Rosenbaum (Docket Entry # 336 ("Rosenbaum Aff.").)

The retainer agreement between Lead Counsel and the Menora Group permitted Lead Counsel to request attorneys fees up to 30% of any eventual recovery. (Pls. Mem. in Support of Attorneys' Fees Award (Docket Entry # 334) ("Pls. Fee Mem.") 7.) After the parties reached settlement, the Menora Group and Lead Counsel began "vigorous negations" over the fee award. (Decl. of Assaf David-Margalit (Docket Entry # 335) ¶ 8.) The Menora Group also consulted

with independent counsel regarding an appropriate fee award for Lead Counsel. (Id.) The Notice of Pendency informed potential class members that Lead Counsel would apply for attorneys' fees not in excess of 27% of the Settlement Amount. (Rosenbaum Aff. Ex. A.) On May 10, 2010, Lead Counsel filed a motion requesting, inter alia, an award of attorneys' fees in the amount of 25% of the Settlement Amount. (Docket Entry # 331.)

The court received three objections to the settlement. One of these was withdrawn. Another objection, filed by a repeat pro se litigant, was patently frivolous. (See Docket Entry # 330.) The only cognizable objection was filed by the Pennsylvania State Employees' Retirement System ("SERS"). (Docket Entry # 344 ("SERS Ltr.").) SERS argued that Lead Counsel's fee request was too large, and suggested instead that the court "award no more than is absolutely required to provide reasonable compensation to counsel."[1] (SERS Ltr. 7.)

This court held the fairness hearing on June 21, 2010. No parties objected at the hearing.

## II. DISCUSSION

### A. Calculating Appropriate Fees in Common Fund Cases

Attorneys who recover a common fund for the benefit of a class of injured plaintiffs "are entitled to a reasonable fee – set by the court – to be taken from the fund." Goldberger v. Integrated Res., 209 F.3d 43, 47 (2d Cir. 2000). "What constitutes a reasonable fee is properly committed to the sound discretion of the district court, and will not be overturned absent an abuse of discretion, such as a mistake of law or a clearly erroneous factual finding." Id. (internal citation omitted). In exercising this discretion,

> [D]istrict courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the

---

[1] SERS does not object to the proposed settlement of the class action, to the proposed Plan of Allocation, to Lead Counsel's request for an award of unreimbursed expenses, or to Lead Counsel's request for a compensatory award to Lead Plaintiff.

3

> risk of the litigation . . . ; (4) the quality of the representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."

Id. at 50 (quoting In re Union Carbide Corp. Consumer Prods. Bus. Sec. Litig., 724 F. Supp. 160, 163 (S.D.N.Y. 1989)).

Courts use two methods to calculate appropriate fees: the "percentage method" and the "lodestar method." Under the percentage method, the court simply awards counsel a reasonable percentage of the recovery as a fee. The lodestar method requires the court to scrutinize the fee petition to ascertain the number of hours reasonably billed, then multiply that figure by an appropriate hourly rate. Id. at 47. "The trend in this Circuit is toward the percentage method, which directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." Wal-Mart Stores, Inc. v. Visa U.S.A. Inc., 396 F.3d 96, 122 (2d Cir. 2005) (internal citations omitted). The lodestar method, by contrast, "creates an incentive for attorneys to bill as many hours as possible, to do unnecessary work, and for these reasons also can create a disincentive to early settlement." McDaniel v. County of Schenectady, 595 F.3d 411, 418 (2d Cir. 2010). The Second Circuit therefore encourages district courts to use the lodestar method primarily as a "cross-check" for the percentage method. Goldberger, 209 F.3d at 50. Any percentage award, however, must still be assessed for reasonableness using the Goldberger criteria.

An additional consideration obtains when the lead counsel and lead plaintiff in a PSLRA class action enter into a fee agreement. In such circumstances, the Second Circuit directs district courts to:

> [G]ive serious consideration to negotiated fees because PSLRA lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable. In many cases, the agreed-upon fee will offer the best indication of a market rate,

4

thus providing a good starting position for a district court's fee analysis. In re Nortel Networks Corp. Sec. Litig., 539 F.3d 129, 133-134 (2d Cir. 2008); see also In re Cendant Corp. Litig., 264 F.3d 201, 282 (3d Cir. 2001) ("[U]nder the PSLRA, courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel.").

**B.  Application of the <u>Goldberger</u> Factors to Lead Counsel's Fee Application**

  1.  The Requested Fee in Relation to the Settlement

When determining whether a fee request is reasonable in relation to a settlement amount, "the court compares the fee application to fees awarded in similar securities class-action settlements of comparable value." In re Marsh & McLennan Cos., Inc. Sec. Litig., No. 04 Civ. 8144 (McMahon, J.), 2009 U.S. Dist. LEXIS 120953, at *56 (S.D.N.Y. Decl. 23, 2009); see also re Nortel Networks, 539 F.3d at 134. Lead Counsel's request for 25% of the Settlement Amount is consistent with, or lower than, the fee awards in other "megafund" securities fraud actions in this Circuit. See In re Initial Pub. Offering Sec. Litig., 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (awarding lead counsel 33.3% of $586 million settlement); In re Oxford Health Plans, Inc. Sec. Litig., MDL Dkt. No. 1222 (Brieant, J.), 2003 U.S. Dist. LEXIS 26795, at *13-14 (S.D.N.Y. June 12, 2003) (28% of $300 million); Kurzweil v. Philip Morris Cos., Nos. 94 Civ. 2373, 94 Civ. 2546 (Mukasey, J.), 1999 U.S. Dist. LEXIS 18378, at *2 (S.D.N.Y. Nov. 30, 1999) (30% of $124 million); In re Prudential, 912 F. Supp. 97, 104 (S.D.N.Y. 1996) (27% of $ 110 million); In re Priceline.com, No. 00 Civ. 1884 (Covello, J.), 2007 U.S. Dist. LEXIS 52538, at *12-13 (D. Conn. July 20, 2007) (30% of $80 million). This suggests, at the very least, that Lead Counsel's request is not unreasonable.

This court is aware that other courts have adopted a "sliding-scale" approach to fee awards in megafund cases in order to prevent "unwarranted windfalls" to class counsel. See, e.g., In re Indep. Energy Holdings PLC, No. 00 Civ. 6689 (Scheindlin, J.), 2003 U.S. Dist. LEXIS 17090, at *20 (S.D.N.Y. Sept. 29, 2003) ("The percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement. Otherwise, those law firms who obtain huge settlements, whether by happenstance or skill, will be over-compensated to the detriment of the class members they represent."). The logic of this approach is appealing, if not altogether airtight: for example, it ignores the possibility that a sliding scale may actually harm class members by reducing attorneys' incentive to accept greater risk in pursuit of above-average recoveries.

But whatever the merits of the sliding-scale method, its underlying rationale – to avoid awarding unearned or unanticipated benefits to class counsel – is inapplicable in this case. It was clear when Comverse's financial troubles were first announced that the potential recovery in any successful lawsuit against Comverse would be substantial. (See, e.g., Amended Compl. (Docket Entry # 74) ¶¶ 152-60.) Nonetheless, the Menora Group and Lead Counsel contracted at the outset of this litigation for a fee award as high as 30% of the eventual recovery. After the settlement amount had been determined, the Menora Group negotiated a 25% fee request. The fact that this fee request is the product of arm's-length negotiation between Lead Counsel and the lead plaintiff is significant. Whether a court uses the percentage or lodestar method, its primary goal when awarding fees is to approximate the prevailing market rate for counsel's services. See Goldberger, 209 F.3d at 52 ("[M]arket rates, where available, are the ideal proxy for [class counsel's] compensation'); In re Nortel Networks, 539 F.3d at 133-134; McDaniel, 595 F.3d at 420; cf. Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,

522 F.3d 182, 184 (2d Cir. 2008) (awards in fee-shifting cases should approximate market rates). Because attorneys and clients ordinarily strike their bargain prior to litigation (i.e., when the risk of loss still exists), an ex ante fee agreement is the best indication of the actual market value of counsel's services. See In re Synthroid Mktg. Litig., 264 F.3d 712, 719 (7th Cir. 2001) (opinion of Easterbrook, J.); In re Nortel Networks, 539 F.3d at 133-134 ("In many cases, the agreed-upon fee will offer the best indication of a market rate"). Presumably, the Menora Group's decision not to negotiate for a sliding-scale fee award was based on its assessment of the risks of the litigation, Lead Counsel's competence, the rates of settlement in comparable securities actions, and all the other considerations that clients ordinarily take into account when contracting for attorney services on an open market. The court sees no need to impose its own ex post assessment of Lead Counsel's value when the retainer and fee agreements speak for themselves.

Using the lodestar as a cross-check confirms the reasonableness of Lead Counsel's request. Lead Counsel expended 43,573 hours of attorney and support time valued at rates ranging from $125 to $880 per hour, generating a $20,245,585 lodestar figure. (Dahlstrom Decl. Ex. B.) Although high, these rates are not extraordinary for top New York law firms. See In re Gilat Satellite Networks, Ltd., No. 02 Civ. 1510 (Sifton, J.), 2007 U.S. Dist. LEXIS 68964, at *54 (E.D.N.Y. Sept. 18, 2007) (citing cases).[2] The hours Lead Counsel expended on this action are reasonable given the magnitude and complexity of the case. (See Dahlstrom Decl. ¶ 137); see also Goldberger v. Integrated Res., 209 F.3d at 50 (where lodestar method is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court.").

---

[2] See also Nathan Koppel, Lawyers Gear Up Grand New Fees, Wall St. J., Aug. 22, 2007, available at http://online.wsj.com/article/SB118775188828405048.html (last visited June 23, 2010).

Where, as here, counsel has litigated a complex case under a contingency fee arrangement, they are entitled to a fee in excess of the lodestar. Detroit v. Grinnell Corp., 495 F.2d 448, 470 (2d Cir. 1974). The requested fee in this case represents a lodestar multiplier of 2.78. This multiplier is well within the range awarded in comparable settlements. See Welch & Forbes, Inc. v. Cendant Corp., 243 F.3d 722, 742 (3d Cir. 2001) (surveying cases with recoveries over $100 million and finding lodestar multiplier of 1.35 to 2.99 common); Kurzweil, 1999 U.S. Dist. LEXIS 18378, at *8 (noting that multipliers between 3 and 4.5 are common in federal securities cases, and awarding 25% attorneys' fee); In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ("multipliers of between 3 and 4.5 have become common").

2. The Risk of the Litigation

The risk of the litigation is often cited as one of the most important Goldberger factors. See, e.g., In re Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d 229, 233 (S.D.N.Y. 2005). "Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation. In particular, securities actions have become more difficult from a plaintiff's perspective in the wake of the [Private Securities Litigation Reform Act]." In re Metlife Demutualization Litig., 689 F. Supp. 2d 297, 361 (E.D.N.Y. 2010) (quotations and citations omitted).

Lead Counsel invested tens of thousands of hours of attorney time and over $1.6 million of its own money to litigate this case. (Dahlstrom Decl. Ex. C.) It did so despite the fact that the Menora Group faced serious challenges with respect to establishing liability and damages. Had the litigation proceeded, the Menora Group would have faced conflicting evidence concerning the materiality of the alleged misstatements regarding backdated options, the

8

scienter claims against the Compensation/Audit Committee defendants, and loss causation for the interim partial disclosures. (See Dahlstrom Decl. ¶¶ 99-117.) Even if liability was established, there was also a substantial risk that the jury would award damages lower than those calculated by the Menora Group's expert. There was also a risk that Comverse's deteriorating cash condition would make it unable to pay a substantial settlement. (Id. ¶¶ 120-25.) In short, a positive outcome was by no means guaranteed.

### 3. The Time and Labor Expended By Counsel and the Magnitude and Complexities of the Litigation

This case, while perhaps not as enormous as some other recent securities class actions, was large, protracted, and bitterly contested. Lead Counsel expended 43,573 hours on the litigation. Among other things, Lead Counsel: reviewed seven million pages of documents, as well as SEC filings, analyst reports, and public filings in nine other securities cases; filed multiple complex pleadings; briefed oppositions to protective-order motions, a motion for class certification, papers in support of the settlement, and six motions to dismiss; successfully appealed a Report and Recommendation; deposed 10 Comverse employees, defended three depositions, and interviewed 30 former Comverse employees throughout the United States and Israel; and prepared and reviewed highly complex accounting and damages analyses with the aid of experts. (Dahlstrom Decl. ¶ 137.) These efforts were hardly makework, given the uncertainty of key issues relating to liability and damages. Lead Counsel also engaged in lengthy, contentious settlement and mediation sessions over the course of a eighteen months. (Id. ¶¶ 74-98.) The results of this labor speak for themselves: as of May 2010, this settlement is the second largest securities class action settlement involving options backdating claims. (Pls. Fee Mem. 5.)

### 4. The Quality of Lead Counsel's Representation

To evaluate the quality of representation in common-fund litigations, courts in this Circuit "review the recovery obtained and the backgrounds of the lawyers involved in the lawsuit." Merrill Lynch Tyco Research Sec. Litig., 249 F.R.D. 124, 141 (S.D.N.Y. 1998). As outlined above, the recovery in this case is one of the highest ever achieved in this type of securities action. Lead Counsel has extensive experience in complex federal civil litigation, including securities fraud class actions. (Dahlstrom Decl. Ex. A.) The court also notes that, throughout this litigation, it has been impressed by Lead Counsel's acumen and diligence. The briefing has been thorough, clear, and convincing, and as far as the court can tell, Lead Counsel has not taken short cuts or relaxed its efforts at any stage of the litigation.

### 5. Public Policy Considerations

Private securities class actions are "a most effective weapon in the enforcement of the securities laws and are a necessary supplement to [SEC] action." Eichler v. Berner, 472 U.S. 299 (1985) (internal quotation marks and citation omitted). For these reasons, "public policy supports granting attorneys' fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC." Bristol-Myers Squibb, 361 F. Supp. 2d at 236; see also In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives.").

A 25% fee award in a $225 million settlement is certainly sufficient incentive to pursue securities cases of this magnitude. And while it may be that a lower percentage would also be sufficient, this court will not pretend that it has the expertise necessary to divine the ideal

percentage or construct an accurate sliding fee scale. This court is particularly unwilling to undertake such an endeavor in a case where the fee award was set on the open market, and where an improperly calibrated fee would provide a disincentive to future counsel to take risks and pursue large class settlements that the SEC cannot.

## III. CONCLUSION

For the foregoing reasons, this court finds that Lead Counsel's request for a fees award in the amount of 25% of the Settlement Amount is fair and reasonable under Goldberger and the prevailing law in this Circuit.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
June 23, 2010

NICHOLAS G. GARAUFIS
United States District Judge